Robert WAGSTAFF, Petitioner,

v.

**SUPERIOR COURT, FAMILY COURT DIVISION et al., Respondents.**

**No. 2208.**

Supreme Court of Alaska.

May 12, 1975.

Robert H. Wagstaff, in pro per.

James Lane Rhoads, Melchor P. Evans, Anchorage, for respondents.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

CONNOR, Justice.

In this case, which arose from two separate proceedings in family court, we are presented with issues concerning attorney-client relationships with juveniles in non-delinquency matters.

## I.

The factual background of the two matters is as follows:

### A. *In the Matter of K. R.*

K. R., a fifteen-year-old female, appeared before the court on a petition for dependency in December of 1973. Her mother was deceased; her father was missing and was believed to be dead. The question of a possible estate and the need for a guardian arose at this proceeding. No one was appointed at that time.

By March of 1974, the father was officially declared dead. At a dependency hearing at that time, K. R.'s social worker requested a guardian or an attorney to help with the probate of the estate. The court expressed the view that it was the duty of the Attorney General to represent K. R.'s interests and, therefore, appointed no private party to assist her.

In April, 1974, the social worker requested the probate court to appoint a conservator, and one was finally appointed in May of 1974. Sometime during the period when she had no court-appointed representative, K. R. contacted petitioner Wagstaff, a practicing attorney, about the probate matter. Attorney Wagstaff alleges that, after doing considerable work on the matter, he was informed that the family court master did not believe that petitioner was entitled to represent K. R., since a court appointment was a necessary prerequisite for the representation of a juvenile. However, he was at no time formally refused the right to represent K. R.

### B. *In the Matter of J. T.*

J. T., a fourteen-year-old female, left home in February of 1974 and sought police aid in obtaining foster placement. She was placed in temporary custody with the Division of Family & Children's Services in their emergency shelter, which she left after two days. A day later, she returned and was detained at McLaughlin Youth Center.

The following day, she was interviewed by a family court intake officer and released to her parents' custody. She then refused to remain home and, at her parents' request, was again placed in detention on the authority of the intake officer. Finding that her actions tended to endanger her health, welfare and morals, the officer filed a petition alleging that she was a "child in need of supervision", pursuant to AS 47.10.010(a)(3).

At the hearing on the petition, attorney Wagstaff made an appearance, claiming to be J. T.'s attorney. He stated that he had become involved in the proceeding at the request of the minor, who had contacted him the previous evening. Also present were Mr. Wayne Ross, an attorney for the girl's parents, the parents, Micheale Giesler of the Division of Family & Children's Services, attorney Edith Glennon of the Attorney General's office, and Mr. Kord Rosen-Runge from Alaska Children's Services.

Mr. Ross objected to the presence of Mrs. Giesler, Mr. Rosen-Runge and Mr. Wagstaff. Pursuant to statute, the first

two persons were excluded on the grounds of being potential witnesses.[1]

Attention then was turned to the matter of Mr. Wagstaff. Mr. Ross objected to his presence on the theory that the parents should choose the juvenile's attorney since they would be monetarily liable, and that a juvenile had no capacity to contract for the attorney's services. He also argued that the juvenile did not have a right to an attorney in a "child in need of supervision" proceeding, and to allow one in a non-delinquency "family problem" would be contrary to the beneficent purposes of the family court.

The master maintained that J. T. had a right to counsel "because there's a possibility of her being detained", but he expressed the belief that the parents, rather than the child, should choose the attorney. He stated that,

".  .  . [S]hould this child desire to be represented by an attorney, I will appoint an attorney to represent her at the parents' expense. I do not feel that—if she feels her interests are divergent from those of her parents that she should be compelled to accept an attorney that her parents retain for her. However, I feel that since I am compelling the parents to pay, that they are at least entitled to the right of having a choice in selecting an attorney since it is my decision that the child be represented. For that reason, I will excuse you [Wagstaff] from this hearing."

After petitioner Wagstaff refused to leave, he was assisted in his exit by the security bailiff.

The master next told J. T. that she was entitled to be represented by an attorney, and she said that she would like a lawyer. He then engaged in an extended colloquy with Mr. Ross and J. T. This discussion revealed that J. T.'s father was to be transferred to Utah, and the parents wanted J. T. and her mother to precede him to that state. In fact, the plans were to leave that same evening. Any court-ordered counseling would, of necessity, be of short duration.

The master asked J. T. if she had any objection to this plan. J. T. at first said that she had no objection to the arrangement but then hesitated stating:

".  .  . I need time to think about it because I don't know. And, if we go to Utah, I mean, it's just going to be more of a hassle down there because we'd just have to start all over again, but they don't seem to understand. And they don't want me to go to a receiving home, which I don't know why. If I stay up here for a couple of weeks and think about it, I mean, I don't know what I want to do. I can't make up my mind what I want to do. I can't make up my mind what I want to do for the next 3 years or anything, I have to have time to think about it, and why they want me to go down to the states, I do not know why we can't stay up here."

The court pointed out that she would have access to the family court in Utah if further problems were to arise. J. T. eventually said that she was satisfied, and the recommendation was made that the petition be dismissed. The dismissal order was signed by Superior Court Judge Lewis, and J. T. was released to the custody of her parents.

Mr. Wagstaff, that same day, filed a motion for extraordinary relief with this court, asking that the superior court be directed to allow him to represent J. T., and that she be prohibited from being sent to Utah. The motion argued that any decisions made by minors without counsel of choice were invalid. The motion was supported by an affidavit of the crisis-director

1. AS 09.20.180 provides:
"Upon the request of either party the judge may exclude from the court room any witness of the adverse party not under examination at the time so that he may not hear the testimony of other witnesses."

of Alaska Children's Services stating that, in his opinion, the removal of J. T. would be detrimental to her mental health as well as to the possibility of a positive resolution of the family problem.

This court immediately remanded the matter to Superior Court Judge Lewis, who, because of the imminent departure of J. T. and her mother, went to the airport and conducted a hearing with J. T. and her parents. Before going to the airport, he discussed the situation with Mr. Wagstaff and Mr. Ross, and both were present at the airport. It is unclear from the record whether these two men participated in the airport conversation which Judge Lewis had with J. T. and her parents.

Judge Lewis came away from the discussion with the impression "that the 'crisis' was either contrived, or blundered into, and that it appeared that Alaska Children's Services and Mr. Wagstaff were interlopers" at the time they entered the case. Judge Lewis determined that the order of dismissal would stand, and J. T. and her mother apparently went to Utah.

## II.

The questions presented for review from the two fact situations are:

(1) whether a juvenile may establish an attorney-client relationship with an attorney of his choice;

(2) if a minor may establish such a relationship, whether such choice should be permitted whenever the juvenile determines an attorney is necessary; and

(3) whether any persons the juvenile or his attorney desires to be present at the proceeding must be permitted to remain."

Because of the different nature of the two matters giving rise to the issues presented for review, the questions will be discussed in the context of the two different fact situations. First, however, there are several jurisdictional questions which must be answered.

### • III.

██ This case originally reached this court by petition for extraordinary relief in the nature of mandamus. Attorney Wagstaff, as petitioner, requested that the family court be directed to cease interfering with attorney-client relationships in the juvenile court. However, since the children are no longer before the court, and the matters are, for all practical purposes, closed, mandamus is inappropriate. The trial court cannot be ordered to allow petitioner to represent persons no longer before the court.

The Superior Court urges that lack of service of process upon the Attorney General is fatal to the jurisdiction of this court, basing its contention on Appellate Rules 25(a)(3) and 39(b).[2] The record is unclear as to whether the Attorney General was in fact served. Petitioner alleges in his brief that the Attorney General's office was served by ordinary and certified mail, but no documentation appears in the record.

██ Proof of service may be "by certificate of an attorney . . . or by any

---

2. Appellate Rule 25(a)(3) provides:

   "(3) Except as provided in paragraph (6) of this rule, the petition shall be served on opposing parties and when filed shall be accompanied by proof of service. If the petitioner seeks relief heretofore available by writ of prohibition or mandamus, or both in the alternative, it shall be served on the persons to whom the order granting relief is sought to be directed, and in addition, shall be served on every other party to the proceedings in respect of which relief is desired."

Appellate Rule 39(b) provides:

   "If the State of Alaska or an officer or agency thereof is a party, service of all motions, notices, briefs, petitions or other documents shall, notwithstanding the foregoing paragraph, be made upon the Attorney General of Alaska, at Juneau, Alaska. A copy shall also be served upon the attorney of record (if he is not the Attorney General) who represented the State of Alaska or its officer or agency in the court whose judgment, order or decision is involved."

other proof satisfactory to the court." Civil Rule 5(f)(1). Under the unusual circumstances of this case, we find petitioner's signed brief adequate to satisfy this requirement.

The Superior Court next argues that Attorney Wagstaff does not have the requisite standing to bring the issues in this petition before us.

The modern requirements for standing are somewhat less rigorous than their earlier counterparts. In Sierra Club v. Morton,[3] the four-man majority opinion of the Supreme Court speaks of standing in terms of "injury-in-fact" to the party seeking review.[4]

In United States v. SCRAP,[5] the court explained:

"'Injury in fact' reflects the . . . requirement that a person be 'adversely affected' or 'aggrieved', and it serves to distinguish a person with a direct stake in the outcome of litigation—even though small—from a person with a mere interest in the problem."[6]

While the injury-in-fact requirement has been relaxed, it has not been abandoned, as it is necessary to assure the adversity which is fundamental to judicial proceedings. However, the degree of injury need not be great.[7]

It is clear that economic harm falls within those cognizable interests anticipated by the injury-in-fact doctrine.[8] Certainly Mr. Wagstaff's interests cannot be characterized as minute, indeterminable, remote, fluctuating or uncertain.[9] He clearly suffered a direct economic injury when the court master prevented him from representing a client.

In addition, Mr. Wagstaff's concern arises in a context which caises a fundamental constitutional issue. In Sierra Club v. Morton,[10] the Supreme Court noted that,

". . . the fact of economic injury is what gives a person standing to seek judicial review . . . but once review is properly invoked, that person may argue the public interest in support of his claim . . . ."[11]

In NAACP v. Alabama,[12] the court held that a litigant is not restricted to asserting constitutional rights personal to himself if "[the] constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court."[13]

Turning to the facts in the present case we find that in *K. R.*, petitioner has not alleged, and the record does not show, that in any proceeding he requested and was denied the right to represent K. R.[14]

---

3. 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

4. *Id.* at 734–35, 92 S.Ct. 1361.

5. 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

6. *Id.* at 689 n. 14, 93 S.Ct. at 2417.

7. It has been stated that:
"The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 613.
This language was cited with approval in the *SCRAP* opinion, *Id.*

8. *See e. g.*, Sierra Club v. Morton, 405 U.S. 727, 737, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Data Processing Service v. Camp,

397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

9. *Compare* Frothingham v. Mellon, 262 U.S. 447, 486–87, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

10. 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

11. Id. at 737, 92 S.Ct. at 1367. *See also* Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

12. 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

13. Id. at 459, 78 S.Ct. at 1170.

14. K. R. submitted an affidavit for this review in which she stated that she had contacted Robert H. Wagstaff directly and met with him and asked him to help her; he said he would, and they talked several more times and he advised her of the progress he was

Nor has petitioner alleged any injury arising from the exclusion of potential witnesses from proceedings in the *K. R.* case. Had he contested the exclusion of third parties at the time of the hearing, or made clear why their presence was important, he might now claim some interference with his interests; but this is not the case. Therefore, we find that as to the *K. R.* matter petitioner has no standing.

■ However, in the matter of *J. T.* the petitioner clearly demanded the opportunity to represent the minor child, and this demand was expressly denied by the court master. In view of the fact that Mr. Wagstaff was personally denied the right to represent *J. T.*, and the difficulty that unrepresented juveniles may have in asserting their right to counsel, we conclude that Attorney Wagstaff has standing to assert *J. T.*'s rights.

Respondent finally argues that the case is moot since *J. T.* is now outside the jurisdiction of the court. This court has recognized a "public interest" exception to the mootness doctrine in In re G. M. B., 483 P.2d 1006 (Alaska 1971).[15] In *G. M. B.*, we found that juvenile detention between adjudicative and dispositive hearings was a matter of broad public interest and likely to recur. Therefore, we decided the question even though the minor had been released, "[i]n order to provide guidance to the superior court for the administration of juvenile justice . . . ." *G. M. B., supra,* at 1008.

The *G. M. B.* decision provides guidelines which aid in determining when this court will hear a matter that normally would be regarded as moot. There we stated:

"To invoke the [public interest] exception, a two pronged test must be met: The dispute must be a recurring one, and its nature must be such that the mootness doctrine, if applied, would effectively [preclude review of the issue]." *G. M. B., supra,* at 1008.

■ Applying this test to the present case, we find that the representation of juveniles is a matter of broad public concern. The issue of that representation is inherent in every proceeding in which a child has an interest and, therefore, is "recurring." In addition, every time a child is denied an attorney, the question is likely to evade review, since the juvenile will have no representative through whom he can present a claim on appeal. We are satisfied that the requirements of the exception to the mootness doctrine have been met, and so hold.

### IV.

In determining whether a child is permitted to retain counsel to represent him at a "child in need of supervision" hearing,[16] we must examine certain provisions of Alaska's Children's Rules.

Children's Rule 14(a) provides:

*"Right to Counsel.* Where a child matter has not been closed by informal adjustment or disposition, the child, his parents, guardian, or custodian shall, upon the filing of a petition for adjudication, be informed of their respective rights to be represented by counsel in all

---

making; she then learned from Michaele Giesler that the Family Court's position was that a child does not have the right to contract for an attorney; and she went to court to ask for an attorney to be appointed and was told that it was the responsibility of the Attorney General's office to represent her.

However, neither K. R. nor Wagstaff ever informed the court that K. R. wished to be represented by Wagstaff himself.

15. The *G. M. B.* decision, at 1008 n. 6, cited with approval a California case entitled In re M., 3 Cal.3d 16, 89 Cal.Rptr. 33, 37, 473 P.2d 737, 741 (1970). The latter decision states:

" . . . if a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during it pendency would normally render the matter moot." In re M., supra, at 741.

16. AS 47.10.010(a)(3) provides in part:

"Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the minor . . . habitually so conducts himself as to injure or endanger the morals or health of himself or others . . . ."

subsequent stages of the proceedings. The court shall advise the child, his parents, guardian, or custodian on the record, of their right to court appointed counsel provided their circumstances qualify them under the provisions of Rule 15."

In addition, Children's Rule 12(c) provides in part:

"The presence of the following parties is required at the child's hearing:

.    .    .    .    .    .

(4) Counsel for the child or other parties, if counsel was retained or was appointed."

We hold that where, as here, a juvenile matter has reached the formal adjudicative stage,[17] Rule 14(a) requires the child's chosen counsel to be present at the hearing. Moreover, since, prior to the hearing, J. T. had retained counsel, under Rule 12(c)(4), the presence of the child's counsel was required.

We note further that, under Children's Rule 12(e)(2), the court was under a duty to explain to J. T. her right to counsel.[18]

Respondents next argue that a juvenile has no power to retain the services of an attorney. We do not need to decide this question of contract law. It is sufficient to observe that the enforceability of such a contract would be determined by the law regulating minors' contracts.[19]

Respondents also argue that, if a juvenile has the power to retain an attorney, his parents may select the counsel who will represent the juvenile. Where, as in the present case, the express interests of the child and the parents are hostile, choice of the child's attorney by the parents might create an irreconcilable conflict of interest.[20] For this reason, the juvenile's choice of counsel in a "child in need of supervision" adjudication must be respected whenever possible.

Where the parents' interests are hostile to the child's, the parents may not select the child's attorney. The child may retain the attorney of his choice or, in the alternative, ask the court to appoint an attorney for him. If the child has retained counsel, the court must respect the child's choice.

Respondents finally argue that our holding will instantly emancipate children and terminate the natural right of parents to guide and counsel them. It is urged that a "child should not lose his cloak of love, nurture, and guidance when he enters the halls of justice." In answer to this, it must be pointed out that in most instances the child would not be in court unless a serious problem in the parent-child relationship has developed. We assume that with the benefit of hearing arguments on both sides of the controversy, the court will be able to give substantial consideration to the need for parental love, nurture, and guidance, in determining the future welfare of the child.

In summary, we hold that it was error to deny to J. T. her chosen attorney.

The rulings below with respect to K. R. are affirmed. Affirmed in part and reversed in part.

---

17. Children's Rule 8(b) states that formal proceedings for adjudication are commenced by the filing of a verified petition for adjudication. That step has been taken in this case.

18. Rule 12(e)(2) provides:
"The court shall explain to the child and to his parents, guardian or custodian their respective rights to counsel as provided for in Rules 14 and 15."

19. We note, in passing, that the court cannot pay counsel unless the court has appointed counsel and the requisites of Children's Rule 15 have been satisfied.

20. This court has noted that in juvenile proceedings ". . . careful judicial scrutiny is needed to assure no conflict of interest between the parent's duty to advance his child's interests and his own desire to use the court in order to discipline the child . . ." R. L. R. v. State, 487 P.2d 27, 35 (Alaska 1971). *Cf.* Sheridan v. Sheridan, 466 P.2d 821, 825 n. 16 (Alaska 1970), where we noted that in contested custody cases the trial court, in its discretion, is empowered to appoint guardians ad litem to represent the interests of minor children.