Earle C. FOSTER, Appellant,

v.

STATE of Alaska and John J. Schnabel, Appellees.

John J. SCHNABEL, Cross-Appellant,

v.

Earle C. FOSTER and State of Alaska, Cross-Appellees.

Nos. S–1846, S–1885.

Supreme Court of Alaska.

March 11, 1988.

Barry Donnellan, Fairbanks, for appellant/cross-appellee Foster.

James N. Reeves, Bogle & Gates, Anchorage, for appellee/cross-appellant Schnabel.

Margot O. Knuth, Asst. Atty. Gen., and Grace Berg Schaible, Atty. Gen., Juneau, for appellee/cross-appellee State.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

PER CURIAM.

These cases involve competing claims of title to three parcels of land located near Haines, Alaska. The properties are on Porcupine Creek, an active gold-mining district in the early part of this century, subsequently abandoned, and now active again.

The State of Alaska, one of the claimants, bases its claim on its 1957 foreclosure pursuant to the Land Registration Law, ch. 134, SLA 1953 (codified as amended at AS 34.10.010–.240 (repealed 1978)). This act was designed in part to return abandoned land to the State.

Earle Foster, the second claimant, bases his claim on a provision in the Land Registration Law that the record owner at the time of foreclosure or his assigns can repurchase the land for a nominal fee. AS 34.10.220(a). Foster maintains that he is an assign of the record owner at the time of foreclosure and that the State has wrongfully refused to allow him to repurchase the properties.

John Schnabel, the third claimant, asserts title to only one of the three parcels. His claim is by adverse possession: Schnabel's predecessor-in-interest, and then Schnabel himself, actively mined the parcel from 1954 until recently. Schnabel cannot gain title by adverse possession against the State. However, he claims that the State's foreclosure was unconstitutional due to lack of notice, and thus was void. If the foreclosure was void, Schnabel's adverse possession was against a private owner, not the State.

The superior court found for the State. As for Foster, the court found that he has no right to repurchase, since it is not clear who the record owner was at the time of

foreclosure and whether Foster is an assign of the record owner. As for Schnabel, the superior court did not reach his constitutional argument. Instead, the court held that he lacks standing to challenge the validity of the foreclosure, and furthermore, that such a challenge is barred by the doctrine of laches.

Both Foster and Schnabel appeal.

## I. FOSTER'S CLAIM

### A. Background

The version of the Land Registration Law germane to these appeals was adopted by the Territory of Alaska in 1953. Ch. 134, SLA 1953 (codified as amended at AS 34.10.010–.240 (repealed 1978)). The Law required owners to register with the district recorder any real property located outside of organized cities. AS 34.10.040. Failure to register would result in a fine of $5 and a lien on the property. AS 34.10.-050. In cases of continued non-payment, the state could foreclose, resulting in complete termination of any prior interest.[1] However, "[t]he record owner at the time of ... foreclosure or his assigns may, at any time before sale of the foreclosed property by the state, repurchase the property" for the nominal amount of the foreclosure judgment, plus interest. AS 34.10.220.[2]

We believe that two purposes of the Land Registration Law are evident from its terms: (1) to determine ownership of remote parcels, and (2) to return abandoned land to the state.

Pursuant to the Land Registration Law, the Territory foreclosed in 1957 on the three parcels Foster now claims. The parcels are known as U.S. Mineral Surveys (M.S.) 572, 574, and 636, because they were originally staked as mining claims before being patented by the federal government. Following foreclosure proceedings, deeds to the properties were issued to the Territo-

---

1. Foreclosure pursuant to this procedure entitled the state not only to the $5 penalty in arrears, but to complete ownership of the parcel. AS 34.10.080–.130.

2. The repurchase provision was added in 1959. Ch. 179, § 4, SLA 1959. While most of the Land Registration Law was repealed in 1978, the repurchase provision remained in effect until July 18, 1983. Ch. 182, §§ 20 and 26, SLA 1978; ch. 113, § 26, SLA 1981.

ry of Alaska in 1958. The State then succeeded to the Territory's interests.

Foster, a newcomer to the three properties, obtained quitclaim deeds to them in 1981, presumably for the purpose of repurchasing the properties from the State. He filed the complaint which initiated this suit in April, 1982, seeking to compel the State to allow him to repurchase the properties. John Schnabel and the State were among the defendants. In its answer to the complaint, the State alleged that Foster had failed to exhaust his administrative remedies.

In January of 1983, Foster pursued his administrative remedies by filing applications with the Department of Natural Resources ("DNR") to repurchase the properties. He presented evidence of the chain of title, attempting to show that he was an assign of the former record owner and eligible to repurchase under AS 34.10.220. The DNR denied his applications because he failed to clearly establish who the record owner was at the time of foreclosure, and whether Foster was an assign of that record owner. In other words, the chains of title were full of gaps.[3]

After the DNR made its decision, Foster renewed this litigation, seeking to establish his right to repurchase the properties. At that point, Schnabel, one of the defendants, counterclaimed that he owned M.S. 572 in fee simple.

The superior court granted summary judgment to the State on the question of present ownership of the three parcels. The court, apparently treating Foster's action as an appeal of the prior administrative decision, affirmed that decision rejecting Foster's repurchase application:

> The Land Registration Law does not provide for judicial determination of the most probable record owner at the time of the foreclosure.... As a matter of law, where the record owner of the property is not clear from the record, no statutory right to repurchase exists.[4]

On appeal, Foster challenges the superior court's ruling rejecting his right to repurchase the parcels. The issues are (1) whether the superior court erred in treating Foster's case as an administrative appeal; and (2) assuming the court was correct in treating the case as an appeal, whether the court erred in affirming the administrative decision.

### B. Standard for granting a repurchase application

The foreclosure process established by the Land Registration Law makes good title out of bad. Thus, the State received perfect title[5] following foreclosure, thereby terminating the long history of gaps in the chain. If the State were now to *sell* the parcels, the buyer would take perfect title. However, the buyer would have to pay the State a fair purchase price.

■ Repurchase is another story. Like a foreclosure sale, repurchase also passes perfect title. But the repurchaser, rather than paying market value, pays only the nominal amount of the foreclosure judgment—which in this case is a mere $8.30 plus interest. *See* AS 34.10.050. We be-

---

**3.** One such gap involves the supposed transfer from Alaska–Sunshine Gold Mining Co. to Anne Fritsche. August Fritsche, who previously had controlled Alaska–Sunshine Gold Mining Co., died in 1937 leaving his stock in that company to his widow Anne. Subsequently, the company was dissolved, apparently by the Territory of Alaska in 1950. Foster claimed that title to the properties passed by operation of law to the stockholders at that time—namely, to Anne Fritsche. Yet the DNR found that Foster had established neither (1) that the properties went to the shareholders, as opposed to creditors or purchasers; nor (2) that Anne Fritsche was the only, or even principal, stockholder when the company was liquidated. In fact, during the

proceeding below, two other minor shareholders were discovered.

**4.** The court probably meant that there is no right of repurchase if the owner of record is not clear from the *land* records—not the DNR's *adjudication* records. The court apparently refused to consider Foster's evidence outside the land records, with which he attempted to bridge the gaps in the chains of title.

**5.** Although the State has perfect title, it is a contingent title: If a proper assignee of the former record owner seeks to repurchase, the State must allow that assignee to do so. AS 34.10.220(a).

lieve that the Territorial Legislature did not intend that a repurchaser should get the benefit of perfect title without paying for it. Instead, especially at this late date, repurchase can be allowed only when the title is good at the onset. That is, the repurchaser has the burden of establishing that, but for the foreclosure, the chain of title leading to him is perfect.

Registration pursuant to the Land Registration Law was a procedure to compile information. Unlike a quiet title action, registration was not a procedure to make good title out of bad. An owner who did register his land had no better title than he had before he registered. Therefore, it makes no sense to allow a chain of owners who did not register their land, and in fact abandoned it for perhaps 45 years,[6] now to obtain better title than they would have, had they properly registered it.

However, the statutes never explicitly required that a prospective registrant have perfect title. In fact, the Territory or State may have never before challenged a statement of ownership filed pursuant to the Land Registration Law. Why, then, should the State refuse to recognize the imperfect title of a repurchase applicant? The answer is that timely filing of a registration statement did not entitle a registrant to any new rights; if the title was full of holes, it remained full of holes. In contrast, granting an application to repurchase bestows a valuable new right—perfect title —for a nominal fee. Thus, the State is justified in requiring that an applicant's claim be indisputable, before granting him that valuable right.

6. The three parcels were probably abandoned by their "record owners" in the 1930's, following the death of August Fritsche.

7. "Action to quiet title. A person in possession of real property ... may bring an action against another who claims an adverse estate or interest in the property for the purpose of determining the claim." AS 09.45.010.

8. "Actions for recovery of real property. A person who has a legal estate in real property and has a present right to the possession of the property may bring an action to recover the possession of the property...." AS 09.45.630.

## C. Was the case an administrative appeal?

■ Foster claims the superior court erred in treating this action as an administrative appeal, rather than as an action to completely re-examine his chain of title. We disagree. The Land Registration Law does not establish a right to a superior court determination of eligibility to repurchase. Instead, it addresses jurisdictional questions only in the most general language: "The Department of Natural Resources shall administer this chapter." AS 34.10.010. We interpret this as a grant of original jurisdiction exclusively to the DNR. Agency determinations, of course, are subject to judicial review under Appellate Rule 601.

Nor does any other statute create a cause of action for Foster that could be brought directly in superior court to determine one's right to repurchase. For example, the right to a quiet title action is spelled out in AS 09.45.010, but only for one in possession of property.[7] An owner not in possession of property may bring an action for ejectment under AS 09.45.630.[8] But since Foster does not claim to be the current owner, he has no present right to eject. While a declaratory judgment action might seem possible pursuant to AS 22.10.-020(b), such actions cannot normally be used to circumvent limitations inherent in appeals, such as scope of review.[9] Also, the case was not so pleaded.

■ Even without a statutory cause of action, the superior court arguably could have exercised its equitable powers to examine Foster's chain of title anew. Equitable jurisdiction generally is not depend-

9. *Punohu v. Sunn,* 666 P.2d 1133, 1135 (Hawaii 1983) ("since the scope of review ... in an appeal ... is much more limited than the court's plenary authority in an original action commenced before it, it would be anomalous to permit a declaratory judgment action to be substituted for an appeal from an agency determination ..."); *V-1 Oil Co. v. County of Bannock,* 97 Idaho 807, 554 P.2d 1304, 1305–07 (1976). Cf. *Jefferson v. Asplund,* 458 P.2d 995, 998 (Alaska 1969) ("the courts should guard against the use of the declaratory judgment action as a means of procedural fencing").

ent on statutory authorization. *See, e.g., Dutton v. Rocky Mountain Phosphates,* 438 P.2d 674, 684 (Mont.1968); *Marley v. Cannon,* 618 P.2d 401, 404 (Okla.1980); *Robinson v. Manning,* 378 P.2d 277, 280 (Or.1963). But, "[t]he exercise of equitable jurisdiction is a matter of discretion for the trial court." *Wolff v. Arctic Bowl, Inc.,* 560 P.2d 758, 770 (Alaska 1977).

Thus, Foster's only right in superior court was the right to appeal the adverse agency determination. The superior court, in its appellate capacity, could have granted a trial de novo. Alaska R.App.P. 609. However, it declined to do so, stating, "This court will not decide the probable record owner or discount gaps in the chain of title."

Since Foster has advanced no good reason why he should be allowed to present the same evidence twice, we will not disturb the superior court's exercise of discretion.[10]

**D. Did the court correctly affirm the DNR decision?**

The DNR held that Foster was not eligible to repurchase, since he did not satisfy the statutory requirement of being "[t]he record owner at the time of ... foreclosure or his assign[]."[11] Foster argues that the DNR was mistaken, and that the superior court was wrong to affirm. The basis for this argument is that the "DNR failed to appreciate the distinction between the 'record owner' and the 'assign' of the record owner." Foster admits that it is unclear which of two people was the record owner at the time of foreclosure. But, he claims the uncertainty is irrelevant since he is the assign of both of them. Thus, Foster claims that he is eligible to repurchase. Furthermore, he asserts in his brief that "there is no requirement in the Land Registration Law that the 'assign' of the record owner be of record."

The administrative decision does not indicate that the DNR considered only evidence from the land records. Rather, the decision indicates in great detail that Foster simply failed to establish both who the record owner was, *and* whether Foster is an assign (either on or off the record) of that person.

The question whether Foster is an assign of the former record owners is a question of fact. Foster presented evidence to show that he was an assign. The DNR found his evidence inadequate. The appropriate standard of review for agency factual findings is the "substantial evidence" test. *See State Alcoholic Beverage Control Bd. v. Decker,* 700 P.2d 483, 486 (Alaska 1985); *Storrs v. State Medical Board,* 664 P.2d 547, 555 (Alaska 1983). This court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Galt v. Stanton,* 591 P.2d 960, 962–63 (Alaska 1979) (quoting *Keiner v. City of Anchorage,* 378 P.2d 406, 411 (Alaska 1963)). The DNR identified numerous gaps in Foster's evidence which are certainly adequate to support the agency's decision. The superior court correctly affirmed the DNR decision, and we AFFIRM.

**II. SCHNABEL'S CLAIM**

**A. Background**

Schnabel claims title to M.S. 572, one of the three parcels which Foster sought to repurchase. He grounds his claim on adverse possession by his predecessor or, in the alternative, by Schnabel himself.

In 1970, Schnabel purchased a quitclaim deed to the property for $5000 from Fred Emerson. Emerson originally entered the property in 1954—several years before the Territory's foreclosure. He mined the property, using a D–4 Cat and a sluice box, for the 1954 season. He worked there

---

**10.** Foster also argues that the DNR decision is void, since it never promulgated rules as required by statute. AS 34.10.010. We do not address this argument: it is untimely, in that Foster first made it on appeal. *See Zeman v.*

*Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985).

**11.** AS 34.10.220. *See supra* text accompanying note 2.

seven days a week during the mining season, but lived about a half mile away on another property. He continued mining until about two years before he sold the property to Schnabel in 1970. During the period of his use and occupancy, Emerson posted the property against trespassers, charged others for using the road he built on the property, paid taxes on the property, and exercised dominion over it. Furthermore, he filed federal mining claims, notices of annual assessment work, and a "Statement of Real Property Ownership" covering the property. Emerson's occupation of the property was unquestionably open and notorious.[12]

From 1970, when Emerson quitclaimed the property to Schnabel, through 1982, Schnabel continued Emerson's pattern of occupancy and mining. If M.S. 572 were privately owned, Emerson and Schnabel, either alone or together, may have met the requirements for gaining title by adverse possession.[13] However, the State claims title pursuant to the deed following foreclosure. A person cannot acquire state land by adverse possession. AS 38.95.010.

Schnabel alleges that he was completely unaware of the State's interest in M.S. 572 until 1980. Upon becoming aware, he submitted a repurchase application under the Land Registration Law. In July of 1984, the DNR rejected Schnabel's application, on the ground that Schnabel was not an assign of the *record* owner, since Emerson's claim was by adverse possession.[14] When Foster filed his second amended complaint in May of 1985, Schnabel answered, alleging as a counterclaim against Foster and a cross-claim against the State that Schnabel owned M.S. 572 in fee simple.[15]

Schnabel's claim is based on his argument that the 1957 foreclosure is void, since the record owner was not given proper notice, in violation of statutory and constitutional requirements.[16] If the fore-

---

**12.** Emerson and Schnabel consecutively mined M.S. 572 for almost thirty years, investing substantial sums of money in their work. However, this case is not about the right to mine and use the property. Schnabel already has a valid mining claim on M.S. 572. This case is about *fee* ownership of the property. There is some question about whether Emerson's, and later Schnabel's, use was adverse to the State's fee interest. Their use of the property is consistent with the theory that they claimed mining rights, but no more. In fact, the filing of the various federal and state documents can be seen as an admission of non-ownership. The superior court did not reach these questions.

**13.** The requirements for adverse possession are that the possession be uninterrupted, notorious, and hostile, for ten years. *See, e.g., Shilts v. Young,* 567 P.2d 769, 775 (Alaska 1977).

**14.** This decision was affirmed by the superior court, and is not being appealed here.

**15.** The answer was filed September 19, 1985. Schnabel also raised this allegation earlier, as part of his motion for summary judgment against Foster on May 7, 1985.

**16.** Schnabel's claim is as follows: The Land Registration Law required that, prior to foreclosure, the Territory post, publish, and file with the court a list of properties to be foreclosed upon, with "the name of the respective owner thereof, if known." § 22–2–24, ACLA; ch. 135, § 5 SLA 1955. Schnabel alleges, first, that this notice requirement is inadequate and does not pass federal constitutional muster. Notice must be "reasonably calculated to apprise the parties of the pendency of an action." *Rosenberg v. Smidt,* 727 P.2d 778, 781 (Alaska 1986) (referring to the rule established in *Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950)). Significantly, in 1959, the State Legislature amended the statute to require that the "last known owner" be notified by registered mail. Ch. 179, § 3, SLA 1959. Second, Schnabel alleges that the Territory failed to comply with even its own deficient requirement. On the posted list of pending foreclosures, the "known owner thereof" of M.S. 572 was identified as W.S. Cranston. Schnabel alleges that all the parties agree that W.S. Cranston was not the record owner of M.S. 572 in 1957. In fact, the DNR found that "all Cranston's interest" in M.S. 572 was conveyed to E.E. Harvey by deed recorded in 1907. Thus, the name on the foreclosure list may have simply been incorrect, further frustrating the statutory and constitutional notice requirements.

The state contends that the foreclosure actions were not against individuals at all, but instead were *in rem* actions. The record owners were not parties to the foreclosure proceedings. In any event, thirty years later it is nearly impossible to tell whether the true record owner had actual notice. The State believes that the foreclosure proceedings were widely discussed in newspapers. The record owners may have had actual notice. Actual notice would have cured any defect in the Territory's procedure. We do not reach these questions.

closure was void, the *record* ownership is still in private hands. In that case, Emerson's adverse possession was effective to gain title, which was then quitclaimed to Schnabel.

The superior court did not decide whether Emerson or Schnabel, alone or together, would have satisfied the requirements for adverse possession against a private owner. Nor did the court decide the merits of Schnabel's statutory and constitutional claims. Instead, the court held that Schnabel had no standing to challenge the validity of the foreclosure, and furthermore, that such a challenge would be barred by the doctrine of laches. Schnabel appealed.

## B. Laches

■■■ We have previously recognized that the doctrine of laches applies solely to actions in equity. *Kodiak Electric Ass'n v. Delaval Turbine, Inc.*, 694 P.2d 150, 157 (Alaska 1984). Schnabel's assertion that he owns M.S. 572 in fee simple is essentially a request of the court to remove a cloud on his title—an action generally considered equitable in nature.[17] Furthermore, once a court obtains jurisdiction for equitable purposes, it may dispose of all issues before it, whether equitable or legal. *See, e.g., Burnworth v. Hughes*, 670 P.2d 917, 922 (Kan.1983); *Thisted v. Country Club Tower Corp.*, 405 P.2d 432, 435–36 (Mont.1965); *Wittick v. Miles*, 545 P.2d 121, 124 (Or. 1976). Thus, laches is entirely appropriate to bar Schnabel's claim of deficient notice.[18]

The question of whether the facts support a finding of laches is left largely to the discretion of the court below:

We will not overturn a trial court's decision that an action is barred by laches unless we have a firm and definite conviction that a mistake has been committed. *Young v. Williams*, 583 P.2d 201, 204 (Alaska 1978).... This is the same test used to determine whether a trial judge's findings are "clearly erroneous."

*Pavlik v. State, Dep't. of Community and Regional Affairs*, 637 P.2d 1045, 1047 (Alaska 1981) (citation omitted).

■■■ The superior court correctly identified the test: Laches requires that the plaintiff has unreasonably delayed in bringing the action, resulting in undue prejudice to the other party. *City and Borough of Juneau v. Breck*, 706 P.2d 313, 315 (Alaska 1985). The court found that Emerson, Schnabel's predecessor-in-interest, knew of the State's claim for at least twenty years. Neither this finding, nor the implicit decision that twenty years is "unreasonable," is clearly erroneous. Even if a stale claim could be revived by transferring the underlying interest, which it generally cannot, Schnabel would still be barred. He claims to have been ignorant of the foreclosure judgment and ensuing deed to the Territory until ten years after he bought his quitclaim deed. By then, the foreclosure judgment and deed had been a matter of public record for over thirty years. One who purchases a mere quitclaim deed cannot insulate himself from the consequences by not checking the record. Even after Schnabel "discovered" the State's interest, he took no action to challenge the foreclosure until five years later, on the eve of trial in September of 1985, when he filed an answer to Foster's second amended com-

---

**17.** *See, e.g., Seliner v. McKay*, 2 Alaska 564, 565 (1905). Until 1962, Alaska's quiet title statute specifically provided that such an action was "of an equitable nature." § 56–1–91, ACLA 1949 (which includes actions to remove a cloud, as we held in *Davis v. Tant*, 361 P.2d 763, 765 (Alaska 1961)). In 1962, those words were deleted, while the rest of the section remained nearly intact. Ch. 101, § 6.01, SLA 1962 (codified at AS 09.45.010). The legislature may have intended to provide a cumulative remedy at law—which, presumably, would be subject to the statutes of limitations.

For other states that consider such actions to be equitable, see *Beal v. Mars Larsen Ranch Corp.*, 586 P.2d 1378, 1383 (Idaho 1978); *Nedry v. Morgan*, 584 P.2d 1381, 1383 n. 1 (Or.1978); *Harsha v. Anastos*, 693 P.2d 760, 762 (Wyo. 1985). *But see Holland v. Wilson*, 327 P.2d 250, 252 (Utah 1958).

**18.** For an analogous use of laches to bar a quiet title action, see *Lowrance v. Gunderson*, 487 P.2d 511 (Mont.1971).

plaint.[19] We think that this delay was unreasonable.

The court also found that "[t]he State is prejudiced by the problems inherent in having to defend an action undertaken nearly 30 years ago. Evidence that may have been available at the time is most likely not still available." For example, if the record owner had actual notice, then procedural deficiencies would be cured. Yet, this would be very difficult to establish 30 years later. The court's finding is not clearly erroneous.

For these reasons, we AFFIRM the superior court's holding that Schnabel's claim is barred by laches.

MOORE, J., with whom BURKE, J., joins, concurring.

MOORE, Justice, with whom BURKE, Justice, joins, concurring.

I concur. However, in my opinion, Schnabel lacks standing to contest the adequacy of notice given by the Territory prior to its 1957 foreclosure.

The test for standing previously set forth by this court is broad: "[A]ll that is necessary is a 'sufficient personal stake in the controversy to guarantee "the adversity which is fundamental to judicial proceedings." ' " [1] The court has "departed from a restrictive interpretation of the standing requirement ... adopting instead an approach 'favoring increased accessibility to judicial forums.' " *Trustees for Alaska v. State*, 736 P.2d 324, 327 (Alaska 1987) (citations omitted).

Yet, to say that any potential litigant who is willing to risk attorney's fees is adverse enough to have standing would be incorrect. Each case is examined on its facts. *See, e.g., id.* at 329; *Hoblit v. Commissioner of Natural Resources*, 678 P.2d 1337, 1341 (Alaska 1984) (remanded for a determination whether a sale of neighboring state land without shoreline easements would increase pedestrian traffic on plaintiff's land, thereby injuring him).

We have identified two kinds of standing: interest-injury standing, and citizen-taxpayer standing. *Trustees*, 736 P.2d at 327. Schnabel's claim lies in the interest-injury category, in which "a plaintiff must have an interest adversely affected by the conduct complained of." *Id.* While the degree of injury need not be great, *id.*, we have never held that standing can be created by wagering on whether *someone else's* injury will ultimately be vindicated.

Under the interest-injury approach, a litigant can have standing either to protect his own rights, or, in rare cases, to protect the rights of third parties by acting in a representative capacity. *See Wagstaff v. Superior Court, Family Court Division*, 535 P.2d 1220, 1225–26 (Alaska 1975).

If Schnabel's claim of standing is based on protecting his own rights, there is a gap in the causal connection between the allegedly-improper notice and Schnabel's injury. Even had the Territory tried to send personal notice by registered mail to the record owner of M.S. 572, to whom would they have sent it? To this day, the record owner is unknown. Perhaps the strongest candidate is Porcupine Mining Co., a corporation dissolved years before the foreclosure, with unknown successors in interest.[2] Thus, even if the Territory had used its best efforts to provide notice, in all likelihood the foreclosure would have occurred anyway. It is too speculative to say

---

**19.** In 1980, the year he supposedly discovered the State's 1958 foreclosure, Schnabel filed a repurchase application and a state mining claim. These two filings are not a challenge to the State's title, but a recognition of it.

**1.** *Adams v. Pipeliners Union 798,* 699 P.2d 343, 346 (Alaska 1985) (quoting *State v. Lewis,* 559 P.2d 630, 635 (Alaska 1977), *appeal dismissed,* 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1073 (1977) (quoting *Moore v. State,* 553 P.2d 8, 23 (Alaska 1976))).

**2.** Foster, in his second amended complaint, alleges the record owner in 1957 was the Porcupine Mining Co. The DNR decision regarding Foster's repurchase application states: "According to information available at the Department of Commerce and Economic Development, Porcupine Mining Co. (a Delaware corporation) was 'dissolved' on January 2, 1946" (footnote omitted).

that the former record owner would have received the notice, would have prevented foreclosure by paying off the State's lien, and then would have allowed Emerson to continue his adverse possession. The causal connection between the allegedly defective notice and Schnabel's present predicament is too attenuated to confer standing upon him.

The causation aspect of standing has never been well developed by this court. However, federal courts have addressed the issue at length. To have standing in federal court, a litigant must show that *but for* the challenged action, his injury would not have occurred. *See Warth v. Seldin,* 422 U.S. 490, 504–08, 95 S.Ct. 2197, 2207–2210, 45 L.Ed.2d 343, 358–59 (1975) (in a challenge of restrictive zoning practices, litigants lacked standing because they failed to allege facts showing that, "absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield"). In *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 40–45, 96 S.Ct. 1917, 1225–1227, 48 L.Ed.2d 450, 462–64 (1976), the Court held that the causation requirement of standing is not merely prudential, but is mandated by Article III.[3]

In Alaska state courts, standing restrictions are prudential, rather than constitutionally mandated. In this case, the party entitled to notice was the 1957 record owner. That person, whomever he may be, does not claim that the notice was defective. Under these circumstances, it is imprudent to entertain such a claim by one who was not injured by the alleged violation. To do so would be a misallocation of judicial resources.

Schnabel's alternative basis for standing is that he seeks to protect not his own rights but the rights of a third party—namely, the former record owner. A litigant can have standing to protect the constitutional rights of a third party when a special relationship exists between the two,

and when the third party's rights would otherwise go unasserted. This court allowed standing on this basis in *Wagstaff v. Superior Court, Family Court Division,* 535 P.2d 1220, 1226 (Alaska 1975). However, in Schnabel's case, this basis for standing is totally inapposite: Schnabel seeks to vindicate the rights of the former record owner not to *protect* that person, but instead to possess adversely *against* him. In other words, Schnabel is not an appropriate representative.

For these reasons, I would affirm the superior court's holding that Schnabel lacks standing. As for the defense of laches, I agree that it would otherwise bar Schnabel's claim. However, a person who lacks standing to raise a claim cannot unreasonably delay in asserting it.

---

**3.** The *Warth* and *Simon* opinions have been criticized, primarily because the Supreme Court required such a high degree of certainty in the causal connection. *See* L. Tribe, *American Constitutional Law* 129–34 (2d ed. 1988).