Harvey ADAMS, Appellant,

v.

PIPELINERS UNION 798, United Association, and the Alaska State Commission for Human Rights, Appellees.

No. S–181.

Supreme Court of Alaska.

May 10, 1985.

J. Jeffrey Mayhook, Hedland, Fleischer & Friedman, Anchorage, for appellant.

Richard D. Savell, Fairbanks, for appellee Pipeliners Union 798, United Association.

Nancy R. Gordon, Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for appellee Alaska State Commission for Human Rights.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

Pipeliners Union Local 798 of Tulsa, Oklahoma represented all welder helpers during the construction of the Trans-Alaska pipeline. The position of welder helper is unskilled and requires no special training. One of the Union's functions was to dispatch helpers to work on the pipeline when helpers were requested by pipeline contractors. All dispatches were made by the Fairbanks office of the Union. However, helpers were selected for dispatch from the Union's out-of-work list maintained in Tulsa, as well as from various sources in Alaska. Priority was given to those people who appeared on the Tulsa list. In 1975 there were no blacks on the list.

This is a consolidated class and individual action brought before the Alaska State Commission for Human Rights, charging the Union with, among other things, racial discrimination in violation of AS 18.80.-220(a)(2).[1] The Commission found that the Union had been guilty of racial discrimination during the years of construction of the pipeline, 1975–77. That holding is not disputed. The Commission ordered the Union to cease discriminating against blacks in dispatching welder helpers to jobs in Alaska and in admitting individuals working in Alaska to membership in the Union. In addition, the Commission imposed a quota requiring the Union "in filling any job order in Alaska" to allocate 2.2% of its dispatches to blacks. This quota was to be met by filling one out of every twenty jobs with blacks until the 2.2% was achieved.

The 2.2% quota was based on the percentage of blacks among the population of Alaska during the 1970 census. However, the Union recruited more than half of the helpers that it dispatched on the pipeline from the Southern region of the United States, where the percentage of blacks was 38%.[2]

---

**1.** AS 18.80.220(a)(2) provides:

 (a) It is unlawful for

 . . . . .

 (2) a labor organization, because of a person's sex, marital status, changes in marital status, pregnancy, parenthood, age, race, religion, color or national origin, to exclude or to expel him from its membership, or to discriminate in any way against one of its members or an employer or an employee;

**2.** The Commission found that in 1975, 27% of the welder helpers came from Alaska, 56% came from the South, and 17% came from other states. For 1976, 27.5% came from Alaska, 65%

Harvey Adams, the appellant, is an individual claimant whose complaint against the Union was consolidated with the class action. He contends that the relief granted by the Commission is inadequate.

The original class representative in this suit was the Executive Director of the Alaska Human Rights Commission. The Director elected not to appeal the Commission's imposition of the 2.2% quota. Adams, a member of the class, seeks to appeal the Commission's ruling, but the Commission and Union contend that he has no standing since he was neither a named party to the class action nor a certified representative of the class. Thus, the threshold issue to Adams's appeal is whether he has standing to bring it.

## I. STANDING

AS 18.80.135(a) provides that a "complainant ... or other person aggrieved by an order of the commission, may obtain judicial review of the order...." In addition to this provision, there is an administrative framework which allows the Executive Director to represent a class action before the Commission. 6 AAC 30.420.

On its face, AS 18.80.135(a) is quite inclusive: anyone "aggrieved" by a decision of the Commission has standing to appeal the decision. The meaning of "aggrieved," however, is unclear. Other jurisdictions have narrowly construed the meaning of "aggrieved" in the administrative appeals context. A number of cases require the would-be appellant to have a specific, personal, and legal interest in the subject matter of the decision, or to demonstrate that he has a substantial right which has been injured in the administrative decision. *See, e.g. Northeast Occupational Exchange, Inc. v. Bureau of Rehabilitation,* 473 A.2d 406, 408 n. 6 (Me.1984); *Town of Glastonbury v. Freedom of Information Comm'n,* 39 Conn.Sup. 257, 476 A.2d 1090, 1093 (1984); *Iowa-Illinois Gas and Elec. Co. v. Iowa State Commerce Comm'n,* 347 N.W.2d 423, 426 (Iowa 1984); *City of Appleton v. Transportation Comm'n of Wis-*

*consin,* 116 Wis.2d 352, 342 N.W.2d 68, 70 (1983) (specific statute defining aggrieved as person "whose substantial interests are adversely affected"); *Jordan v. Hamada,* 64 Hawaii 451, 643 P.2d 73, 76 (1982); *Group Ins. Comm'n v. Labor Relations Comm'n,* 381 Mass. 199, 408 N.E.2d 851, 854–55 (1980).

These definitions of aggrieved for the purpose of administrative standing conflict, at least in tone, with our general view of standing. In *Carpenter v. Hammond,* 667 P.2d 1204, 1210 (Alaska 1983), we held that to give standing all that is necessary is a "sufficient personal stake in the controversy to guarantee 'the adversity which is fundamental to judicial proceedings.'" (*quoting State v. Lewis,* 559 P.2d 630, 635 (Alaska 1977), *appeal dismissed,* 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1073 (1977)). The question then is whether we should treat the "aggrieved" standard of AS 18.-80.135(a) more strictly than our general view of standing. We think not. No special meaning can be attributed to the word "aggrieved"—it is merely a repository for the concept of standing. So long as the person appealing the decision of the Commission has a sufficient interest in the outcome of the litigation, he will effectively prosecute the action and judicial resources will not be wasted. Further, we have always encouraged "aggressive, large scale enforcement" of Alaska's employment discrimination laws. *Hotel, Motel, Restaurant, Construction Camp Employees and Bartenders Union Local 879 v. Thomas,* 551 P.2d 942, 947 (Alaska 1976). An unduly restrictive standing requirement would be inconsistent with this policy.

Despite the claims of Local 798 and the Commission, Adams does have a personal stake in the outcome of this action. If we determine that a greater percentage of blacks should be dispatched as welder helpers, Adams's chances of being dispatched would be increased. Additionally, Adams has demonstrated his adversity to the Commission's decision by tenaciously pursuing

came from the South, and 7.5% came from other states.

his appeals in this court and in the superior court.

The inquiry does not end here. Even if Adams is "aggrieved" by the Commission's decision, the nature of a class action suit before the Commission may place some limits on his ability to present this appeal.

Chapter 80 of Title 18 of the Alaska Statutes (the chapter which creates the Commission) does not explicitly allow class actions before the Commission. In *Hotel, Motel, Restaurant, Construction Camp Employees and Bartenders Union Local 879 v. Thomas*, 551 P.2d 942, 947 (Alaska 1976), we held that because of its remedial goals, AS 18.80 should be interpreted to allow the Executive Director to represent aggrieved classes in class actions before the Commission. A class action rule, similar to Alaska's Rule of Civil Procedure 23, was adopted by the Commission.[3]

Neither *Hotel, Motel* nor 6 AAC 30.420 contemplate a ruling by the Commission which is viewed as unfavorable or insufficient by the class which the Executive Director represents. In such a situation, the Executive Director might not fairly and adequately represent the class because in order to appeal the Commission's decision, the Executive Director would have to challenge a decision of those who have the power to fire him and direct and evaluate his activities. AS 18.80.060(a). In view of

the Executive Director's potential conflict of interest, and of the remedial nature of AS 18.80, it is fair that someone other than the Executive Director be allowed to appeal a decision of the Commission in a class action. The question is who may appeal.

 The Commission contends that "the better practice" would be to allow an aggrieved class member to appeal a decision of the Commission if that member can show that the Executive Director has failed to adequately represent the class by not appealing and that the individual would adequately represent the class on appeal. This standard has merit, but goes too far. The Executive Director should be presumed to be an inadequate representative when he decides not to appeal. His decisions are subject to the inherent conflict of interest described above. Further, when the Executive Director brings a class action, he is not representing the individual claimants, but the class and the public as a whole. Public and private interests do not always coincide: "In achieving the broad social and economic objectives of the Act, the Commission may be more concerned with the future compliance with the Act by employers than with redressing employee grievances that have accrued already." *McClain v. Wagner Elec. Corp.*, 550 F.2d 1115, 1121–22 (8th Cir.1977).[4]

---

**3.** 6 AAC 30.420 (formerly 6 AAC 30.015). This rule provides in relevant part:

(a) A complaint may be maintained as a class action at a hearing.

(1) The executive director may maintain a complaint as a class action only by identifying the class with specificity and by showing that

(A) the class is so numerous that joinder of all members is impracticable;

(B) there are questions of law or fact common to the class; and

(C) the executive director will fairly and adequately protect the interests of the class.

(2) An individual may maintain a complaint as a class action only if the executive director determines that it is practicable and in the public interest to certify the complaint as a class action and the executive director can show that

(A) the class is so numerous that joinder of all members is impracticable;

(B) there are questions of law or fact common to the class;

(C) the claims of the complainant are typical of the claims of the class; and

(D) the complainant will fairly and adequately protect the interests of the class.

**4.** *See also E.E.O.C. v. Whirlpool Corp., Local 808*, 80 F.R.D. 10, 15 (N.D.Ind.1978). Both this case and *McClain* involve class action suits brought in federal court by the EEOC pursuant to Title VII of the Civil Rights Act of 1964. Alaska's Human Rights Act, AS 18.80, is patterned after Title VII. This court examines relevant federal Title VII decisions for guidance on "the parameters of our anti-discrimination statute." *Alaska State Commission for Human Rights v. Yellow Cab*, 611 P.2d 487, 490 (Alaska 1980). Thus, while the case cited in the text involves a slightly different context (i.e., under federal law, the EEOC brings class actions in federal court whereas under state law the Executive Director brings class actions before the Commission), it is relevant in this instance.

We think that all a class member need do in order to appeal a class action decision of the Commission is to demonstrate that his claim is typical, and that he would adequately represent the class on appeal.[5] The reasons for these requirements are obvious. First, federal due process requires that in order to bind individuals in an action in which they are not direct participants, those individuals must at least be adequately represented.[6] *Hansberry v. Lee,* 311 U.S. 32, 43–45, 61 S.Ct. 115, 118–120, 85 L.Ed. 22 (1940). Second, requiring a would-be appellant to meet the typicality test insures that not every disgruntled class member with an axe to grind can appeal. Last, the class action rule adopted by the Commission (6 AAC 420) requires typicality and representativeness before an individual may initiate a class action. There is no good reason to suggest that these requirements should not apply when an individual seeks to appeal from a class action ruling.

Having decided that Adams should be required to meet the typicality and representativeness requirements, we turn to the question of what procedures he must comply with in order to satisfy these requirements. Adams made no motion to intervene before the Commission and did not affirmatively demonstrate his representativeness or the typicality of his claims before the Commission or the superior court. Normally, a class member must go through such a procedure. However, in this case we find that Adams clearly satisfied the typicality and representativeness requirements, and it would have been an abuse of discretion to hold otherwise.

First, the typicality requirement usually may be satisfied if the claims of the representative and the other class members are based on the same legal or factual theory. *See* 7 C. Wright and A. Miller, *Federal Practice and Procedure* § 1764 (Supp.1984). Here, Adams, like other blacks, was wrongfully denied employment on the basis of his race. The action before the Commission sought imposition of a quota, and that is what Adams is seeking on appeal. In essence, Adams's claim is what the class claimed before the Commission; the only difference is that Adams is claiming that the quota imposed is insufficient.

Second, applying the standard for adequate representation contained in the seminal case *Eisen v. Carlisle & Jacquelin,*[7] it appears that Adams is an adequate representative. His attorney has shown himself to be "qualified, experienced and generally able to conduct the proposed litigation." 391 F.2d at 562. It is obvious from the vigorous way that this appeal has been conducted that there has not been any collusion between Adams and the Commission or Local 798. Additionally, Adams's interest could not be considered "antagonistic to those of the remainder of the class." *Id.* All that Adams is seeking to do is to add to the chances that members of the class will be dispatched as welder helpers. His position could not be antagonistic to any class member's interest.

---

**5.** *See* 6 AAC 30.420(a)(2)(C–D) (*quoted supra* n. 3). Note that 6 AAC 30.420(a)(2)(A–D) contains four requirements for individuals who wish to bring class actions before the Commission. These requirements are substantially identical to the prerequisites contained in Alaska R.Civ.P. 23(a)(1–4). The first two, numerosity and commonality, necessarily were addressed by the Commission when it certified the Executive Director as class representative. *See* 6 AAC 30.-420(a)(1)(A) and (B). Thus, only typicality and representativeness are relevant when an unnamed member seeks to become the class representative and appeal.

**6.** We reach the same conclusion under the state constitutional due process clause, art. I, § 7.

**7.** 391 F.2d 555, 562–63 (2d Cir.1968), *vacated on other grounds* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974):

What are the ingredients that enable one to be termed "an adequate representative of the class?" To be sure, an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that plaintiff has interests antagonistic to those of the remainder of the class.

■ Third, no class member stands to lose anything if Adams's appeal is unsuccessful on the merits. There still will be a hiring quota imposed on Local 798. Moreover, Adams will not be able to assess class members with a portion of his attorney's fees if he loses on the merits. *See* 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1803 (Supp.1984).[8]

In sum, Adams has standing to bring this appeal.

## II. THE MERITS

On the merits, Adams argues that any quota imposed should reflect the percentage of blacks in the labor market from which helpers were drawn, rather than merely the percentage of blacks in Alaska. At oral argument appellant explained that this could mean a quota based on the weighted average of blacks in the two primary recruitment areas, Alaska and the South, or separate quotas imposed for helpers recruited from each of the areas, proportional to the percentage of blacks in each area.

The Executive Director, in presenting the class action before the Commission, also sought the imposition of a quota significantly greater than could be justified merely by Alaska's resident population of blacks. The Executive Director asked for an order: "That ... one out of every five welder helpers dispatched in Alaska shall be a black person until at least 13% of the

first 750 welder helpers on [the Union's] out-of-work list are black."[9]

The Commission acknowledged authorities indicating that it had "the duty to render a decree which so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future."[10] The Commission found:

Hiring ratios and percentages are appropriate, and in this case, essential. They can be accomplished, as complainant recognizes, by the maintenance of separate but uncomplicated record keeping for work orders pertaining to jobs in Alaska. While perhaps inconvenient for the Union, such procedures would not effectively hamper respondent's ability to carry out its functions.

On the critical issue of whether to impose a quota reflective of the percentage of blacks in the areas from which the Union recruited workers, the Commission stated:

It is recognized that virtually every quota identified in the case law has been derived from percentages of minority persons available in the work force or general population from which the employer draws its labor.

However, the Commission declined to follow these precedents noting that they are based on federal, rather than state laws. The Commission suggested that imposition of an order like that requested by the Executive Director "would effectively extend the Commission's jurisdiction to practices

---

**8.** A court may order that class members be assessed attorney's fees out of a fund created by the representative. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 479, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). However, when there is no fund, a court cannot assess attorney's fees against individual class members. 7A C. Wright & A. Miller, *Federal Practice and Procedure,* § 1803 (Supp.1984).

**9.** All of the parties concede or assume the propriety of imposing some racial quota as a remedy for past discrimination which has been proven in an adjudicative context. Racial quotas imposed in the absence of proved discrimination may stand on a different footing, *see University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and we have no occasion to rule on their validity.

**10.** *See, e.g., Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280, 297 (1975); *Carter v. Jury Commission of Greene County,* 396 U.S. 320, 340, 90 S.Ct. 518, 529, 24 L.Ed.2d 549, 563 (1970); *Taylor v. Jones,* 653 F.2d 1193, 1203–04 (8th Cir.1981); *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 943–44 (10th Cir.1979); *Berry v. Cooper,* 577 F.2d 322, 324 (5th Cir.1978); *Morrow v. Dillard,* 580 F.2d 1284, 1294 (5th Cir.1978); *United States v. Warwick Mobile Homes Estates,* 537 F.2d 1148, 1150 (4th Cir.1976); *Watkins v. Washington,* 472 F.2d 1373, 1376 (D.C.Cir.1972), *cert. denied,* 423 U.S. 835, 96 S.Ct. 61, 46 L.Ed.2d 54 (1975).

outside of Alaska." The Commission drew guidance from the language of AS 18.80.-200(a) which describes the purpose of the Alaska Human Rights Law as the prohibition of "discrimination against an inhabitant of the state." The Commission concluded that "the thrust of the Alaska statute is to protect those persons living in the state from discrimination practiced directly against them." [11]

■ The appellant contends that the imposition of a quota based on the percentage

of blacks in the recruitment areas used by the Union, including areas outside the State of Alaska, would not have been beyond the power of the Commission. We agree. The dispatch decisions were made in the Union's Alaska office for work to be done in Alaska.[12] It is difficult to see how any reasonable question can be raised concerning the Commission's power under these circumstances to prevent racial discrimination against both resident and non-resident workers.[13]

11. The full discussion of the Commission concerning the quota requested by the Executive Director is as follows:

Guidance must be drawn from the language of Title 18.80 itself, and from an analysis of the policy considerations at stake. The purpose of the Alaska human rights law is described as the prohibition of "discrimination against an *inhabitant* of the state ..." AS 18.80.200(a) (emph. added). While it is arguably harmful for the state's residents to witness, and be subject to, the importation of a racially unbalanced work force, the thrust of the Alaska statute is to protect those persons living in the state from discrimination practiced directly against them. It is the moral and legal responsibility of the federal government and of Oklahoma and all the other states involved to combat unlawful discrimination occurring within their respective jurisdictions.

The issue does not appear so simple, however, when faced with the hypothetical of an employer's Outside labor pool, from which it draws most of its workers, containing substantially *fewer* minority members than the Alaska work force. If Alaska had 38 percent blacks in its construction worker labor market, for example, and the South had only 2.2 percent, respondent could justifiably argue that it should not be compelled to relocate its place of hire in order to achieve parity with the Alaskan statistics. *See, Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1979). Faced with such a factual configuration, it would be logical to require the employer to comply with a quota for black hires based on the percentages of blacks available for work in the states in which the actual hiring was done.

Why not, then, apply the same logic to this set of circumstances? The answer is simply that such an approach is not necessitated by the legitimate needs of the state in this instance. In the hypothetical, inhabitants of the state would actually have to sacrifice full protection for their black residents in order to accommodate valid employer concerns. In this instance, with the minority percentages smaller in Alaska than in the employer's work force, no compromise of the ideal solution for Alaskan inhabitants is required to meet respondent's interests. The balancing mechanism is not needed, and no justification exists for extending the Commission's reach beyond its own boundaries.

Respondent, thus, shall be ordered to dispatch blacks and females to Alaska welder helper jobs in proportion to their availability in the Alaska labor market. For the present time, at least 2.2 percent of these dispatches shall be given to blacks, and 7.6 percent to females. These percentages should be altered to reflect new data from the 1980 census and/or state statistical sources once such information is available. To insure that women and blacks are not given the latest, shortest-term jobs, respondent must allocate one dispatch to a black and three to women out of the first 20 welder helper jobs in Alaska each year for so long as the injunction remains in effect. By the time 75 dispatches have been issued for Alaska welder helper positions, the union should have met its entire percentage requirements based on 100 workers. This pattern should continue for each group of 100 dispatches. The union, of course, may exceed these percentages at anytime, and must always adhere to its obligation to dispatch any qualified black or female applicant who seeks work at a time when jobs are available. (Footnote omitted).

12. Officials of the executing contractors would contact the union's business agent in Fairbanks, specifying the number of welder helpers needed. Thereupon, the business agent would dispatch welder helpers from a number of sources in Alaska and Oklahoma.

13. In at least three reported cases courts have approved of orders based on state human rights laws having extra-territorial consequences.

In *Colorado Anti-Discrimination Comm'n v. Continental Airlines, Inc.,* 372 U.S. 714, 721, 83 S.Ct. 1022, 1025, 10 L.Ed.2d 84, 89 (1963), at issue was the order of a state commission requiring the hiring of a black airline pilot. The

The coverage of the anti-discrimination law is not limited to inhabitants. It is unlawful to discriminate against a "person" under AS 18.80.220 and "person" is defined without regard to place of habitation. AS 18.80.300(1). Moreover, if the benefits of the law were limited to Alaska inhabitants, serious and substantial questions concerning the constitutionality of such a limitation under the equal rights clause of the state constitution,[14] the equal protection clause of the federal constitution,[15] and the privileges and immunities clause of the federal constitution would be presented.[16]

Of course, our conclusion that the Commission had the power to impose a quota based on the relevant labor markets inside and outside the state does not mean that the Commission had a duty to impose such a quota. AS 18.80.130(a)(1) governs the remedies which the Commission may impose. It provides:

(a) At the completion of the hearing, if the commission finds that a person against whom a complaint was filed has engaged in the discriminatory conduct alleged in the complaint, it shall order him to refrain from engaging in the discriminatory conduct. The order shall include findings of fact, and may prescribe conditions on the accused's future conduct relevant to the type of discrimination. In a case involving discrimination in

(1) employment, the commission may order any appropriate relief, including but not limited to, the hiring, reinstatement or upgrading of an employee with or without back pay, restoration to membership in a labor organization, or his admission to or participation in an apprenticeship training program, on-the-job training program, or other retraining program....

After a finding of discrimination, the statute mandates an injunction against future discrimination. However, other forms of relief need only be "appropriate." They are permissive and committed to the discretion of the Commission, subject to review on appeal only for an abuse of discretion. AS 44.62.570(b)(3).

The appellant contends that such an abuse is present here since the quota imposed applies to all recruitment areas used by the Union but is based on the percentage of blacks in Alaska, where relatively few blacks reside. Appellant points out (1) that the 2.2% quota will not be of significant help to blacks in Alaska because it can easily be met by the recruitment of

---

act of discrimination took place in Colorado, but the pilot would conduct his work in several states and his employer was engaged in interstate commerce. The United States Supreme Court held that enforcement of the Colorado Anti-Discrimination Law was not improper.

In *Neeld v. American Hockey League,* 439 F.Supp. 459, 462–63 (W.D.N.Y.1977), the plaintiff, a citizen of Canada with sight in only one eye, sought an opportunity to play professional hockey in the American Hockey League. The American Hockey League had a by-law which stated that people with sight in only one eye were ineligible to play for a member club. The court found that the plaintiff probably would succeed on his claim brought against the League and the League franchises located within the State of New York under the New York Human Rights Law which prohibited discrimination against the disabled. Accordingly, the court enjoined the League and the League franchises located within the State of New York from applying the by-law to the plaintiff. The impact of the order would extend beyond the boundaries of the State of New York as there were American Hockey League franchises located beyond New York's boundaries.

In *American Jewish Congress v. Carter,* 19 Misc.2d 205, 23 Misc.2d 446, 190 N.Y.S.2d 218 (N.Y.Sup.1959), *modified,* 199 N.Y.S.2d 157, 10 A.D.2d 833 (N.Y.App.Dept.1960), *aff'd,* 9 N.Y.2d 223, 213 N.Y.S.2d 60, 173 N.E.2d 788 (N.Y.App. 1961), the New York court approved a finding of probable cause that the New York Human Rights Law had been violated by an international oil company hiring prospective employees in New York for employment in Saudi Arabia. It was alleged that the oil company was discriminating against Jews. The oil company's defense was, among other defenses, that the discrimination was required by Saudi Arabia.

**14.** Alaska Const. art. I, § 1.

**15.** U.S. Const. amend. 14, § 1.

**16.** U.S. Const. art. IV, § 2, cl. 1; *see Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1979); *Williams v. Zobel,* 619 P.2d 422, 429–30 (Alaska 1980).

blacks from labor markets outside Alaska; and (2) that the 2.2% quota will not be of significant help to blacks in the labor market outside Alaska because it is so low in comparison to the actual percentage of blacks in that market as to be inconsequential. We find this position to be persuasive. Quotas imposed by the Commission cannot be regarded as appropriate unless they bear a reasonable relationship to the elimination of discrimination where it has occurred. The quota imposed by the Commission in this case does not meet this test.

In its brief, the Commission seeks to justify use of the 2.2% quota by suggesting that the imposition of a quota more reflective of the percentage of blacks in the South would be at the expense of minority groups in the Alaska labor force, namely Alaska natives. We disagree. In the absence of a discriminatory motive which has impelled the use of a particular labor market, an employer or a union is free to recruit from any labor market. All that the anti-discrimination law requires is that employment decisions not be based on race or other impermissible factors. An order requiring a union to correct past discrimination against blacks in one labor market has no necessary relationship to recruitment decisions made by the union in another labor market.

In summary, because the 2.2% quota was based on an erroneous conception of the jurisdiction of the Commission and it is not reasonably designed to eliminate the discrimination found to exist, it is vacated. This case is REMANDED to the superior court with instructions to remand it to the Commission for the imposition of an appropriate remedy.

1. Article I, section 1 of the Alaska Constitution provides, in part: "[A]ll persons are equal and entitled to equal rights, opportunities, and protection under the law." The protection thus provided appears to be greater than that provided by the federal equal protection clause. *See Schafer v. Vest*, 680 P.2d 1169, 1171–72 (Alaska 1984) (Burke, C.J., concurring).

2. Racial quotas, as a remedy for past discrimination, are commonly required and the subject

BURKE, Justice, concurring.

While I concur in the opinion of the court, I wish to emphasize one important point.

To me, the thorny issue in this case is one that the parties do not address: whether hiring quotas based solely on race are ever permissible, *under the equal rights provision of the Alaska Constitution, article I, section 1*.[1] Since the parties to this appeal all concede or assume the propriety of some racial quota, as a remedy for past discrimination, we do not decide this issue. Thus, our opinion should not be read as holding such quotas constitutional; their constitutionality, at least under the Alaska Constitution, remains an open question.[2]

of much debate. The constitutionality of such quotas under the federal constitution is not entirely clear, at least from the decisions of the United States Supreme Court. Under the equal rights provision of the Alaska Constitution, article I, section 1, the answer to this question is even less certain. The issue has never been decided by this court, nor, to my knowledge, by any other court interpreting a provision containing the same language as article I, section 1.