ERA AVIATION, INC., Appellant
and Cross–Appellee,

v.

Sherri Lee LINDFORS, Appellee
and Cross–Appellant.

Nos. S–9062, S–9072.

Supreme Court of Alaska.

Nov. 24, 2000.

Rehearing Granted Feb. 27, 2001.

**42**

Thomas M. Daniel, Helena L. Hall and Marja E. Selmann, Perkins Coie, LLP, Anchorage, for Appellant/Cross–Appellee.

Natasha M. Summit and Randall G. Simpson, Jermain, Dunnagan & Owens, and George T. Freeman, Anchorage, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, EASTAUGH, and BRYNER, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

A jury awarded Sherri Lindfors $50,000 in damages for emotional distress and $725,000 in punitive damages after finding that Era

---

1. Seven of these claims were time-barred.

Aviation, her former employer, had passed her over for promotion because she was a woman and retaliated against her for filing a complaint with the Alaska Human Rights Commission. Era appeals, arguing that the superior court incorrectly instructed the jury that it could find Era liable for discrimination if it relied on Lindfors's gender as simply one factor, rather than as the determinative factor, in deciding not to promote her. We conclude that any error in the jury instructions was harmless, and affirm the verdict. But we find that the jury's award of punitive damages was excessive, and order a remittitur to an award of $500,000.

## II. FACTS AND PROCEEDINGS

Sherri Lindfors worked for Era Aviation, Inc., from 1988 to mid–1995, first as a dispatcher and then as a co-pilot. In March 1995 Lindfors filed a complaint with the Alaska Human Rights Commission alleging, among other things, that James Vande Voorde, a vice president at Era, had failed to promote her because of her sex. Eight months later, after resigning, Lindfors sued Era, alleging that it had discriminated against her because of her sex in sixteen different promotions or upgrades [1] and had retaliated against her for filing a complaint. Lindfors claimed that Era's conduct created such an intolerable work environment that her resignation amounted to constructive discharge.

Lindfors based her retaliation claim primarily on evidence that Era rescinded her June 1995 paychecks while she was out sick with an ear infection; manufactured obstacles that made it impossible for her to pass her annual proficiency check, causing her commercial flight qualification to expire; and placed negative information in her personnel file that destroyed her job prospects as a commercial pilot.

Lindfors also presented evidence that Era generally tolerated a work environment that was demeaning to women. Era employees testified that photographs of nude women and their genitals were posted in the cockpits of Convair planes, and that Era was unre-

sponsive to complaints about the photos. Other female employees testified to offensive sexual remarks or proposals by members of Era's top-level management, including Vande Voorde and Jack Birmingham, Era's counsel and equal employment opportunities (EEO) officer.

The jury concluded that Era had discriminated against Lindfors in the most recent employment decision she challenged by promoting a less qualified male applicant to Twin Otter captain in Bethel. The jury also found that Era had retaliated against Lindfors after she filed her human rights complaint. The jury awarded her $50,000 in emotional distress damages and $725,000 in punitive damages. The jury found against Lindfors on her constructive discharge claim and awarded her no back or front pay. It also awarded her no overtime pay, concluding that she was an exempt professional under the Alaska Wage and Hour Act.

## III. DISCUSSION

### A. The Superior Court's Error in Instructing the Jury Was Harmless.[2]

▮ The Alaska Human Rights Act, which mirrors Title VII of the Federal Civil Rights Act of 1964,[3] bars discrimination in employment "because of" a person's sex.[4] Era argues that the superior court erred in instructing the jury that Lindfors could prevail on her discrimination claim if she proved that "Era intentionally relied upon her sex as *a factor* in deciding not to promote or upgrade her."[5] Because there was only circumstantial evidence of discrimination, Era argues, the jury should have been instructed that Lindfors was required to establish by a preponderance of the evidence that she was held back "because of" her sex—that is, that her sex was a decisive, or but—for, factor in Era's employment decision. In essence, Era argues that the court erred by not instructing the jury in accordance with the distinction between "pretext" and "mixed-motive" cases that we have adopted from the federal courts.

▮ We look to decisions under Title VII in interpreting Alaska's anti-discrimination laws,[6] and have, in large part, endorsed the federal approach to analyzing claims of disparate treatment.[7] We agree with Era that in cases, such as this one, in which there is no direct evidence of discriminatory intent,

2. Whether a jury instruction is erroneous is a question of law to which we apply our independent judgment. *See Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 29 (Alaska 1998). An instruction that incorrectly states the law will be reversed if it results in actual prejudice. *Id.* In evaluating whether there has been prejudice, we put ourselves "in the position of the jurors and determine if the error probably affected their judgment." *Vincent by Staton v. Fairbanks Mem'l Hosp.*, 862 P.2d 847, 851 (Alaska 1993). A special verdict form is subject to this same standard of review. *See Manes v. Coats*, 941 P.2d 120, 125 n. 5 (Alaska 1997).

3. *Adams v. Pipeliners Union 798*, 699 P.2d 343, 347 n. 4 (Alaska 1985).

4. AS 18.80.220(a) provides that "it is unlawful for ... an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's ... sex...."

5. (Emphasis added.) Jury Instruction No. 6 provides in relevant part:

To prevail on her claim for discrimination in upgrades and promotions, Ms. Lindfors must prove that it is more likely than not true that:

1. She was qualified for the positions she sought, and
2. That ERA intentionally relied upon her sex as a factor in deciding not to promote or upgrade her.

Ms. Lindfors is not required to prove that sex was the only factor.

Ms. Lindfors may prove her claim of discrimination by direct or indirect evidence. Direct evidence would include oral or written statements showing a discriminatory motive for ERA's treatment of Ms. Lindfors. Indirect evidence would include proof of a set of circumstances that would allow one to reasonably believe that sex was a motive in ERA's treatment of Ms. Lindfors.

6. *See VECO, Inc. v. Rosebrock*, 970 P.2d 906, 912 (Alaska 1999); *Moody–Herrera v. State, Dep't of Natural Resources*, 967 P.2d 79, 83 (Alaska 1998); *French v. Jadon, Inc.*, 911 P.2d 20, 28 n. 8 (Alaska 1996).

7. *See VECO*, 970 P.2d at 920–21; *Haroldsen v. Omni Enters., Inc.*, 901 P.2d 426, 430 (Alaska 1995).

we apply the "pretext" framework.[8] The aim of a pretext instruction is to assist the jury in determining, on the basis of circumstantial evidence, which explanation more likely accounted for the challenged employment decision: the plaintiff's claim of discrimination, or the defendant's assertion that it was motivated by legitimate factors. As we explained in *Haroldsen v. Omni Enterprises, Inc.*:

> The U.S. Supreme Court adopted the three-part [pretext] analysis for Title VII cases because it is usually impossible for an employee to directly prove that the employer acted with a discriminatory intent. Instead, the employee is allowed to prove such animus inferentially by challenging the employer's stated justifications [i.e., the employer's pretext] for taking the adverse action.[9]

Under this three-part analysis, the plaintiff first must establish a prima facie case[10] of discrimination to "eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejection."[11] If the plaintiff succeeds, the burden of production, but not persuasion, shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the employment decision.[12] Once that occurs, the burden shifts back to the employee to prove that the employer's stated reason was a pretext for discrimination.[13] Then, "the trier of fact proceeds to decide the ultimate question: whether [the] plaintiff has proven 'that the defendant intentionally discriminated against [her]'" because of her sex.[14] The superior court need not instruct the jury on each part of this burden-shifting analysis, but only on the plaintiff's ultimate burden of proof.[15]

In cases where there is direct evidence of discrimination, we instead apply a mixed-motive analysis, which recognizes that discriminatory employment decisions may not be motivated solely by a prohibited characteristic such as race or sex, but may be "based on a mixture of legitimate and illegitimate considerations."[16] Under the mixed-motive framework, once the plaintiff has cleared the initial hurdle of presenting direct evidence of discriminatory intent, the plaintiff's ultimate burden of proof is somewhat relaxed: the jury is instructed that the plaintiff can prevail in a claim of discrimination by showing that gender was simply "a motivating factor," as opposed to the determinative factor, in the adverse employment decision.[17] Still, gender must be a determinative cause, but the burden shifts to the employer on this point. The employer must show that it would have made the same decision even absent considerations of gender.[18] Although the plaintiff may pursue mixed-motive and pretext claims simultaneously, if the jury finds no direct evidence of discrimination, it must find the defendant liable, if at all, under a pretext framework.[19]

8. See *VECO*, 970 P.2d at 918; *Haroldsen*, 901 P.2d at 430.

9. 901 P.2d at 431 (footnote omitted).

10. A prima facie case is established when the plaintiff shows: (1) he or she is a member of a protected class under Title VII; (2) the plaintiff applied and was qualified for a position or promotion for which the defendant-employer was seeking applicants; (3) the plaintiff was denied the position or promotion despite these qualifications; (4) the employer continued to seek applicants consisting of similarly qualified persons. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

11. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

12. See *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Thomas v. Anchorage Tel. Util.*, 741 P.2d 618, 623–24 (Alaska 1987) (adopting federal approach of placing burden of production, but not persuasion, on defendant).

13. See *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

14. *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

15. See *Cabrera v. Jakabovitz*, 24 F.3d 372, 382 (2d Cir.1994).

16. *VECO, Inc. v. Rosebrock*, 970 P.2d 906, 920–21 (Alaska 1999) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

17. *Id.* at 920–21.

18. See *id.* at 920.

19. See *id.* at 921.

■ Lindfors contends that there was direct evidence of discrimination and that the trial court properly instructed the jury under a mixed-motive analysis.[20] She points to her own testimony that Vande Voorde, the head of the fixed-wing division, told her she "had no fucking business being a blankety-blank captain in Bethel. No more than the man on the moon." She also refers to testimony that Danny Purvis, Era's check airman, said Lindfors would "never be a captain at Era." But under even the most liberal interpretation of direct evidence followed in Title VII cases, these statements cannot be construed as direct evidence that sex was a factor in Era's decision not to promote Lindfors.[21] Both statements are ambiguous—they can be interpreted in a discriminatory or benign way—and do not reflect directly on Era's discriminatory animus.[22]

Moreover, the record below makes clear that the case was argued as a pretext case and that the parties and the court viewed Jury Instruction No. 6 as a pretext instruction. Thus, the question is whether the court properly instructed the jury under the pretext framework.

■ We conclude that the superior court erred by instructing the jury that Lindfors's ultimate burden was to show that sex was "a factor" in Era's decision not to promote her. The jury should have been instructed, in line with the weight of federal authority, that Lindfors, in order to prevail on her discrimination claim, must demonstrate that an impermissible factor " 'played a role in the employer's decision-making process and that it had a determinative effect on the outcome of that process.' "[23]

■ The court's error is understandable, given that it issued its opinion before our decision in *VECO*, which indicated for the first time our inclination to adopt the distinction between pretext and mixed-motive frameworks followed by the federal circuit courts.[24] The court's error was also harmless when the jury instructions are viewed as a whole.[25]

Jury Instruction No. 6 permitted the jury to find that Era had violated the Alaska Human Rights Act if it found that Era "intentionally relied upon [Lindfors's] sex as *a factor* in deciding not to promote or upgrade her."[26] But the instruction then elaborated on the causation component by requiring Lindfors to present either direct evidence of "a discriminatory motive" or circumstantial evidence "that sex was a motive" in Era's decision. Jury Instructions Nos. 9 and 10,[27]

20. Lindfors also argues that the instructions, viewed together, more than adequately instructed the jury under a pretext analysis. This argument is addressed below.

21. *See Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 580, 582 (1st Cir.1999).

22. *See id.* at 583 (explaining that inherently ambiguous statements cannot supply strong evidence demanded as prerequisite to mixed-motive analysis, regardless of which federal circuit definition of "direct evidence" is followed).

23. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 932 (3d Cir.1997) (quoting *Miller v. CIGNA Corp.*, 47 F.3d 586, 588 (3d Cir.1995)); *see also Watson v. Southeastern Pa. Transp. Auth.*, 207 F.3d 207, 215, 220 (3d Cir.2000) (using a pretext analysis, the jury must conclude that consideration of the impermissible factor was a "determinative factor" in order to find for the plaintiff); Susan K. Grebeldinger, *Instructing the Jury in a Case of Circumstantial Individual Disparate Treatment: Thoroughness or Simplicity?* 12 Lab. Lawyer 399, 415–17 (1997) (noting that juries are typically asked if the plaintiff's protected status was "a determining" or "a determinative" factor in

the adverse employment action in most federal district courts; but some district courts use "but for" or "because of" language. Instructing the jury that the plaintiff's status must be "the" or "the sole" determining factor could lead to reversal on appeal).

24. *See VECO*, 970 P.2d at 920.

25. *See generally Hout v. NANA Commercial Catering*, 638 P.2d 186, 190 (Alaska 1981) (explaining that jury instructions should be evaluated in light of evidence and considering instructions as a whole).

26. (Emphasis added.)

27. Jury Instruction No. 9 provided:

Ms. Lindfors seeks an award of damages for injuries she claims were caused by ERA's allegedly wrongful conduct. The damages claimed by Ms. Lindfors include back pay (sometimes called past wage loss), front pay (sometimes called future wage loss) and emotional distress.

You may not assume that because I list an item of damages or explain how to measure those

read together, further directed the jury that it could award damages to Lindfors only if Era's wrongful conduct was a *"substantial factor"* [28] in bringing about her loss. Further, if two or more factors combined to cause the loss, one of which was inculpatory, the inculpatory factor would only be considered a legal cause if, by itself, it would have been sufficient to cause the loss and if the conduct was "so important in bringing about the loss that a reasonable person would regard it as a cause and attach responsibility to it." This causation standard in these damages instructions is essentially equivalent to the standard that Era requested in its proposed causation instruction, which would have required Lindfors to prove that Era "intentionally discriminated against her *because of* her sex." [29] Although the appropriate causation standard also should have appeared in the jury instruction on liability, the instruction on damages nevertheless ensured that Lindfors would receive no award unless her gender was an independent legal cause of Era's decision not to promote her. We disagree with Era's assertion that the different causation standards expressed in the liability and damages instructions were likely to confuse the jury. "Jurors are presumed to understand and follow the jury instructions...." [30]

The jury's special verdict form further promoted a correct application of the law by permitting the jury to find Era liable only if Era discriminated against Lindfors "on the basis of sex." Jury Instruction No. 5, reiterated this language, along with the text of Alaska's anti-discrimination law, which makes it unlawful to discriminate in employment "because of a person's ... sex." [31] Reading the instructions as a whole, then, a reasonable jury could not have found Era liable for discrimination if sex played only a minor, non-determinative role in Era's discriminatory employment decision. Even if the jury might have reached that conclusion on liability, the damages instruction explicitly barred it from awarding damages on that basis. Furthermore, the only compensatory damages the jury awarded Lindfors—$50,000 for emotional distress—most likely were compensation for Era's acts of retaliation, not discrimination. In closing argument, Lindfors's counsel stressed that Lindfors's claim of emotional distress stemmed from Era's conduct after she filed her human rights complaint. Era has not challenged the court's instruction to the jury on Lindfors's retaliation claim.

An erroneous statement of law in a jury instruction is not reversible error unless it actually prejudices one of the parties. [32] We conclude that Jury Instruction No. 6 could not have misled the jury to award damages to Lindfors based on an erroneous understanding of the law. The jury instructions that addressed Lindfors's discrimination claim, when read as a whole, are at least as favorable to Era as those Era requested. We thus conclude that the improper wording in Jury Instruction No. 6 was not reversible error.

---

damages that you are required to make an award for that item. For each item of damages claimed, Ms. Lindfors must prove that it is more likely than not true that:
1. She had such a loss or is reasonably likely to have such a loss in the future, and
2. That the loss was legally caused by the conduct of ERA that forms the basis of your verdict.
I will now define the term "legal cause" and explain how to evaluate the items of loss claimed by Ms. Lindfors.
Jury Instruction No. 10 provided:
I will now define legal cause for you. A legal cause of a loss is an act which is a substantial factor in bringing about the loss. There can be more than one legal cause of a loss. If a loss is caused by a combination of (1) discrimination or retaliation or both, and (2) other factors, and each factor by itself was sufficient to cause the loss, then discrimination or retaliation was a legal cause if it was so important in bringing about the loss that a reasonable person would regard it as a cause and attach responsibility to it.

28. (Emphasis added.)

29. (Emphasis added.)

30. *Whiteaker v. State*, 808 P.2d 270, 277 (Alaska App.1991).

31. AS 18.80.220(a)(1).

32. *See Grimes v. Haslett*, 641 P.2d 813, 818 (Alaska 1982).

### B. The Superior Court Did Not Err By Separately Submitting the Discrimination, Retaliation, and Constructive Discharge Claims to the Jury.[33]

■ Era argues that Lindfors's case hinged on proof of constructive discharge, and that the trial court erred by proposing a special verdict form and jury instructions that allowed the jury to award damages for other acts of retaliation and discrimination. Era then argues that the trial court erred by submitting claims to the jury that Lindfors had not previously raised.

This claim is without merit. Era had ample notice that Lindfors might raise discrimination and retaliation as grounds for relief apart from her constructive discharge claim. In her complaint and amended complaint, Lindfors pled and presented facts in support of each cause of action. At trial, Lindfors argued that Era's discrimination and retaliation amounted to constructive discharge—not that its constructive discharge amounted to discrimination and retaliation. Thus, Lindfors did not abandon any of these causes of action, and the jury's rejection of Lindfors's constructive discharge claim did not defeat her discrimination and retaliation claims.[34]

Moreover, Era has not persuasively shown how it might have tried the case differently had it realized in advance that the court would submit the discrimination and retaliation claims to the jury as separate causes of action, rather than as mere evidence supporting Lindfors's claim for constructive discharge. The superior court found that Era "aggressively defended each separate claim." The record supports this finding. We thus conclude that the court acted within its discretion in instructing the jury on each of Lindfors's claims.

### C. The Superior Court Did Not Err in Admitting Cheryl Erickson's Testimony.[35]

■■ Era also contends that the superior court erred in admitting testimony by flight attendant Cheryl Erickson that Jack Birmingham, Era's corporate counsel and EEO officer, made offensive racial and sexual comments.

Erickson testified that Birmingham, while intoxicated, told her late one night when she was at Era that "you look really nice. I'd like for you to have my babies." Birmingham then told Erickson, who is African American, that he had "adopted a black baby in Fairbanks ." When Erickson asked if there was a need for the adoption of black babies in Fairbanks, he said: "ah, I got ya. I adopted this black Labrador retriever in Fairbanks." Birmingham then followed Erickson to the elevator, remarking, evidently in reference to his anatomy, "mine is this long." Erickson testified that she complained directly to Vande Voorde, who reported the incident to Era's president, Chuck Johnson. According to Erickson, Johnson spoke to her about Vande Voorde's report and asked Erickson if she "start[ed] it . . . were you playing with Jack, too?" Erickson testified that she answered in the affirmative, but only because she needed her job. Erickson further testified that, soon after this incident, Johnson and others convinced Birmingham to enter an alcohol rehabilitation program.

The superior court denied Era's motion to exclude Erickson's testimony, reasoning:

The evidence regarding the Erickson/Birmingham incident is relevant. It is probative of Vande [Voorde's] state of mind concerning whether (1) his actions allegedly leading to Lindfors' Human Rights Com-

---

**33.** The superior court has broad discretion to determine whether to give instructions specially tailored to the case at hand. *See Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 29 (Alaska 1998).

**34.** *Cf. VECO, Inc. v. Rosebrock,* 970 P.2d 906, 917–18 (Alaska 1999) (affirming trial court's decision to allow plaintiff to amend her pleading after trial to include complaint for wrongful termination because pleadings placed defendant on sufficient notice of this claim).

**35.** We review a trial court's decision to admit evidence for abuse of discretion. *See Hiibschman v. City of Valdez,* 821 P.2d 1354, 1365–66 (Alaska 1991). An abuse of discretion is found when we are "left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *Peter Pan Seafoods, Inc. v. Stepanoff,* 650 P.2d 375, 378–79 (Alaska 1982).

mission complaint would be investigated thoroughly by Birmingham and (2) the related question of whether Vande [Voorde] could retaliate against Lindfors without fear of suffering employment consequences himself. The evidence will also be relevant if Era puts in issue its general policy or practices regarding compliance with the Human Rights Act or its commitment to equal opportunity employment.

Era argues that Erickson's testimony concerning Birmingham's comments was irrelevant because Birmingham was not involved in the employment decisions that Lindfors contested. There is authority for Era's position.[36] But there was sufficient circumstantial evidence for a reasonable jury to infer that Birmingham was one of the decisionmakers in Era's retaliation against Lindfors.[37] Birmingham was Era's in-house legal counsel and EEO officer when Lindfors filed her complaint with the Human Rights Commission. Although Lindfors's discrimination complaint was turned over to outside counsel, Birmingham testified that he directed Purvis, Era's check airman, to prepare a memo detailing why Lindfors had failed to pass her annual proficiency check—conduct prominent in Lindfors's retaliation claim. Vande Voorde also testified that Birmingham advised him to have the personnel director present when he met with Lindfors to discuss her schedule and incomplete proficiency check.

Furthermore, Era's trial counsel affirmatively portrayed Vande Voorde as "someone who has probably promoted more women to positions of authority at Era Aviation than any other manager there." Yet the evidence of Era's response to Birmingham's conduct, and Vande Voorde's willingness to leave Birmingham in the EEO officer position, could support an inference that Vande Voorde did not take Erickson's complaint seriously. It also could support an inference that, with Birmingham as Era's EEO officer, Vande Voorde knew he could retaliate against Lindfors without adverse consequences.

Era separately argues that Birmingham's racial remarks should have been excluded because they were prejudicial and had no conceivable bearing on Lindfors's claim of gender discrimination. But while it may be that Birmingham's inappropriate racial comments had no independent relevance to Lindfors's claim of sexual discrimination,[38] those comments were inextricably linked to his sexual remarks. Because the entire conversation including the racial comments had inappropriate sexual overtones, the court did not abuse its discretion by allowing the jury to consider the full context of Birmingham's and Erickson's dialogue.[39]

D. *The Punitive Damages Award Was Excessive.*[40]

Era contends that the $725,000 in punitive damages the jury awarded Lindfors

**36.** *See Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1004 (7th Cir.1994) (deciding that affidavits showing general gender discrimination at ATA did not establish a prima facie case of discrimination where there was no link between this information and employment decisions involving plaintiff); *Goff v. Continental Oil Co.,* 678 F.2d 593, 597 (5th Cir.1982), *overruled on other grounds* in *Carter v. South Cent. Bell,* 912 F.2d 832 (5th Cir.1990) (upholding trial court's exclusion of evidence concerning discrimination in other departments at hands of other supervisors where evidence fell short of that required to prove pattern or practice of company-wide discrimination).

**37.** *Cf. Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1214–15 (3d Cir.1995) (upholding admission of evidence of discriminatory remarks by corporate executive where there was sufficient evidence from which jury could conclude that he was decisionmaker for purposes of plaintiff's discharge).

**38.** *Cf. Rauh v. Coyne,* 744 F.Supp. 1181, 1183 (D.D.C.1990) (noting that there is "little reason in common experience to infer that an employer who discriminates against blacks is also likely to discriminate against women"). *But see* Clark Freshman, Note, *Beyond Generalized Discrimination: Use of Acts of Discrimination Against "Other" Minorities to Prove Discriminatory Motivation Under Federal Employment Law,* 43 Stan.L.Rev. 241, 249–50 (1990).

**39.** *Cf. Dulier v. State,* 511 P.2d 1058, 1061 (Alaska 1973) (affirming admission of prior uncharged offenses because they "completed the picture and set the stage for the offense being tried").

**40.** The superior court's decision on a motion for a remittitur or new trial on the issue of punitive damages is reviewed for an abuse of discretion. *See International Bhd. of Elec. Workers, Local 1547 v. Alaska Util. Constr., Inc.,* 976 P.2d 852,

is excessive in light of prior awards in similar cases, the amount of Era's annual earnings, and the jury's rejection of Lindfors's constructive discharge claim.

 Given the jury's finding that Lindfors suffered no special damages and its modest award for emotional damages, we agree that Era's conduct does not justify the jury's punitive damages award. In an analogous case, *Norcon, Inc. v. Kotowski,* we recently concluded that flagrant sexual harassment warranted an award of no more than $500,000.[41] In some respects, the conduct in *Norcon* was more serious than Era's:[42] the plaintiff in *Norcon* was subjected to unwanted sexual touching and was fired when she complained; this treatment was part of an ongoing pattern of harassment that was tolerated by Norcon's management.[43] Era, by contrast, was found to have discriminated against Lindfors in connection with only one promotion decision; Lindfors alleged no physically assaultive or discriminatory conduct. In other respects, the conduct here seems more serious than Norcon's: the sexual harassment in *Norcon,* while more reprehensible, lasted only a few days.[44] In contrast, Lindfors suffered harassment over a longer period of time. Moreover, after she complained of sexual discrimination, Era retaliated by revoking her June paychecks, frustrating her efforts to pass her annual flight proficiency exam, which caused her to lose her commercial flight status, and compiling a personnel record that prevented her from getting another job as a commercial pilot.

 On balance, however, we find that the magnitude and flagrancy of the misconduct in this case is, in broad terms, comparable to and, at worst, does not significantly exceed the misconduct at issue in *Norcon.* Nor is the present case readily distinguishable from *Norcon* in other relevant respects.[45] Since we find these two cases similar, our decision concerning the maximum sustainable punitive damages award in *Norcon* compels us to conclude that the maximum justifiable punitive damage award here is $500,000. Accordingly, we remand with directions to order a remittitur to this amount.[46] Alternatively, Lindfors may request a new trial on the issue of punitive damages.[47]

E. *The Superior Court Did Not Err in Allowing the Jury to Decide if Lindfors Was a Professional Under the*

855, 857 (Alaska 1999). "In order for us to hold that the trial judge has abused his discretion, we would have to be left with the definite and firm conviction on the whole record that the judge made a mistake in refusing to order a remittitur or grant a new trial in response to appellant's motion." *International Bhd. of Teamsters, Local 959 v. King,* 572 P.2d 1168, 1178 (Alaska 1977) (emphasis removed) (quoting *National Bank of Alaska v. McHugh,* 416 P.2d 239, 244 (Alaska 1966)).

41. 971 P.2d 158, 177 (Alaska 1999).

42. In reviewing punitive damages, we take the view that is most favorable to the successful claimant. *See Johnson & Higgins of Alaska, Inc. v. Blomfield,* 907 P.2d 1371, 1374 (Alaska 1995).

43. *See Norcon,* 971 P.2d at 172, 176.

44. *See id.* at 176.

45. Other relevant factors in determining the appropriateness of a punitive damage award include the importance of the policy violated, the relationship between the punitive and compensatory damages, and the defendant's wealth. *See Norcon,* 971 P.2d at 175. Here, the importance of Era's policy violation is roughly equivalent to

Norcon's. Though Lindfors's punitive damage award vastly exceeds her compensatory damages (a ratio of punitive to compensatory damages of almost 15 to 1), this imbalance is not as pronounced as the one that existed in *Norcon* (a post-remittitur punitive-to-compensatory-damages ratio of approximately 48 to 1). *See id.* at 174. Moreover, here, as in *Norcon,* we find no reason to consider this factor, by itself, dispositive. *See id.* at 176. The last relevant factor—the defendant's wealth—also seems roughly comparable. Over a four-year span, Norcon reported pre-tax profits ranging from a high of almost $20 million to a low of $809 thousand, and equity fluctuating from $20 million to approximately $6 million. *See id.* at 174–75 n. 20. By comparison, over a five-year period Era reported more modest annual operating profits (a high of $6.5 million, with an average of approximately $1.5 million), but its net worth remained consistently higher than Norcon's, ranging from $49 to $60 million.

46. *See Exxon Corp. v. Alvey,* 690 P.2d 733, 742 (Alaska 1984) (determining that the amount of remittitur should be the maximum the jury could have awarded which would not be excessive).

47. *See Norcon,* 971 P.2d at 178.

*Alaska Wage and Hour Act.*[48]

In addition to her other claims, Lindfors also asserted a claim for overtime pay under the Alaska Wage and Hour Act (AWHA). The jury rejected this claim. Lindfors argues on cross-appeal that the superior court erred by allowing the jury to decide if she was a professional exempt from overtime pay under the AWHA. Lindfors in effect claims that the court should have granted her motion for a directed verdict on this issue. The superior court concluded that a reasonable jury could find that Lindfors was an exempt professional because as a commercial airline pilot, she had participated in hundreds of hours of training in mathematics, aerodynamics, weather, and navigation and was entrusted with the lives of commercial passengers.

The AWHA requires an employer to pay overtime compensation unless it proves that the employee is "employed in a bona fide ... professional capacity."[49] The employer's classification of the employee is not dispositive.[50] Rather, an employee is an exempt professional if four factors are met: "1) the employee's primary duty is to perform work requiring knowledge of an advanced type; 2) the work requires consistent exercise of discretion; 3) the work is predominantly intellectual and varied; and 4) the work is compensated on a fee basis."[51]

Lindfors argues that the superior court should have held as a matter of law that she was not an exempt professional because Era did not demonstrate that there were material facts in dispute. She relies on this court's ruling in *Dayhoff v. Temsco Helicopters, Inc.* that a helicopter pilot was not an exempt

professional under the AWHA.[52] But our decision in *Dayhoff* was limited to the specific facts of that case. Dayhoff was primarily self-educated: He obtained his commercial helicopter license through self-study and obtained his flight instructor certificate following only ten hours of formal instruction.[53] Moreover, he did not exercise the type of discretion that would characterize him as a professional: He claimed he spent sixty-two percent of his time on non-aviation duties, and had no authority over flight assignments and routes.[54]

In contrast, Era presented sufficient evidence for a reasonable jury to conclude that Lindfors was an exempt professional. Lindfors did not assert that she spent time on non-aviation duties. Moreover, Era's pilots were far more extensively trained than the helicopter pilot in *Dayhoff*. Dale Ferguson, Era's director of training for the fixed-wing division, testified that a commercial pilot's certificate required a private pilot's license and up to 250 hours of additional flying time. For Twin Otter pilots, Era further required a multi-engine rating, an instrument rating, three to four days of ground school, and up to seven hours of flight training. To fly the Convair, pilots needed up to 1,200 hours of flying time on the Twin Otter, an additional eighty hours of ground school training and twenty hours of flight training. There was evidence that both pilots and co-pilots exercised considerable discretion. And Lindfors and other Era pilots testified that they viewed themselves as professionals.

In *American Restaurant Group v. Clark*, we made clear that "the question of the

---

**48.** We exercise our independent judgment in determining if the issue of whether an employee is a professional for purposes of the Alaska Wage and Hour Act is a question of fact for the jury or a question of law for the court. *See generally Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979) (questions of law reviewed de novo). Whether an employee meets the criteria of a professional under the Alaska Wage and Hour Act is a factual question. In reviewing the denial of a motion for a directed verdict, "this court asks whether, viewing the evidence in the light most favorable to the non-moving party, reasonable jurors could differ in their assessment of [that] issue." *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 40–41 (Alaska 1998).

**49.** AS 23.10.055(9).

**50.** *See Dayhoff v. Temsco Helicopters, Inc.*, 848 P.2d 1367, 1372 (Alaska 1993).

**51.** *See id.* at 1371 (citing 8 AAC 15.910(a)(11)).

**52.** *See id.* at 1372.

**53.** *See id.*

**54.** *See id.*

nature of the activities performed" for purposes of determining if an employee is a professional under the AWHA "should be decided by the trier of fact." [55] Viewing the evidence in the light most favorable to Era, reasonable jurors could differ on the issue of whether Lindfors was a professional employee. The court thus did not err in denying Lindfors's motion for a directed verdict and allowing the issue of overtime pay to go to the jury.

F. *The Superior Court Did Not Err in Failing to Apply a Risk Enhancement or Lodestar Multiplier to Lindfors's Attorney's Fees.* [56]

 Lindfors also argues on cross-appeal that she should have been awarded enhanced attorney's fees under the lodestar method because discrimination cases are often taken on a contingency fee basis and have limited financial benefits. [57] She argues that a contingent risk multiplier is necessary to ensure that competent counsel are available to take such cases.

The superior court denied Lindfors's motion for enhanced or lodestar attorney's fees, reasoning that there was no basis for departing from the Alaska Civil Rule 82 schedule for attorney's fees because the litigation was not unreasonably complex or lengthy given the size of the award; a substantial portion of the plaintiff's efforts were directed towards claims on which she did not prevail; and the defendant did not engage in vexatious conduct.

We agree with the superior court. Rule 82 provides an adequate mechanism for the court to grant enhanced fee awards in appropriate cases. [58] This court has affirmed lodestar or risk-enhanced fees only in exceptional circumstances, when there was a strong public interest involved, or the attorneys stood to receive no compensation other than the fees granted by the court. [59]

Lindfors argues that sex discrimination cases are like class action, worker's compensation, and public interest cases, and that the superior court as a policy matter should have awarded enhanced fees. But Lindfors does not establish the factors this court has found compelling in prior cases: that she is a public interest plaintiff; [60] that her attorneys stand to receive no compensation beyond the fees awarded by the court; [61] or that her case is of the type that would make it difficult to attract capable counsel without the potential of enhanced fees. [62] Instead, she argues that a multiplier should be applied simply because of the risk involved in contingent fee cases. [63]

We agree that "[c]ivil rights cases, including those where only money damages are sought, may have a public value which cannot

55. 889 P.2d 595, 599 (Alaska 1995).

56. The trial court has broad discretion in awarding attorney's fees and this court finds no abuse of discretion "absent a showing that the award was 'arbitrary, capricious, manifestly unreasonable, or ... stem[med] from an improper motive.'" *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 44 (Alaska 1998) (quoting *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 766–67 (Alaska 1992)).

57. Under the lodestar/multiplier method, courts calculate the " 'lodestar' by multiplying the reasonable hours expended by a reasonable hourly rate. The court may then enhance the lodestar with a 'multiplier,' if necessary, to arrive at a reasonable fee." *See In re Washington Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1294 n. 2 (9th Cir.1994) (citations omitted).

58. *See* Alaska R.Civ.P. 82(b)(3).

59. *See Municipality of Anchorage v. Gentile*, 922 P.2d 248, 265 (Alaska 1996) (remanding so trial court could consider risk-enhanced fees in class action case); *Wise Mechanical Contractors v. Bignell*, 718 P.2d 971, 975 (Alaska 1986) (affirming enhanced fees in worker's compensation case); *Thomas v. Bailey*, 611 P.2d 536, 539, 541–43 (Alaska 1980) (finding public interest plaintiff entitled to lodestar fees, but not risk-enhanced fees).

60. *See Thomas*, 611 P.2d at 539.

61. *See Wise Mechanical*, 718 P.2d at 975.

62. *See Gentile*, 922 P.2d at 264–65.

63. This court has rejected contingency fee risk enhancements in the context of civil rights cases brought under 42 U.S.C. § 1988. *See Singh v. State Farm Mut. Auto. Ins. Co.*, 860 P.2d 1193, 1202 (Alaska 1993) (citing *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)).

be measured economically." [64] But contingency fee cases do not involve the same risk of discouraging capable counsel presented by cases in which we have endorsed risk enhancement. "An attorney operating on a contingency—fee basis pools the risks presented by his various cases: cases that turn out to be successful pay for the time he gambled on those that did not." [65]

Moreover, in this case, the contingency fee arrangement does not threaten to deprive Lindfors of the compensation to which she is entitled, because the bulk of her award is in the form of punitive damages. Punitive damages are not intended to compensate the victim, but to punish the defendant; thus they are, "from the plaintiff's standpoint, a windfall." [66]

## IV. *CONCLUSION*

The jury's verdict that Era is liable for discrimination and retaliation is AFFIRMED. The superior court's decisions to allow the issue of overtime pay to go to the jury and to deny enhanced attorney's fees are also AFFIRMED.

Because the punitive damages award is excessive, we order a remittitur to $500,000. If Lindfors does not accept this award, a new trial shall be held on the issue of punitive damages.

FABE and CARPENETI, Justices, not participating.

---

**64.** *Singh,* 860 P.2d at 1204 (Matthews, J., dissenting in part).

**65.** *Dague,* 505 U.S. at 565, 112 S.Ct. 2638.

**66.** *Alaska Hous. Fin. Corp. v. Salvucci,* 950 P.2d 1116, 1123 (Alaska 1997).